1  CRAIG H. MISSAKIAN (CABN 125202)
   United States Attorney
2
   MARTHA A. BOERSCH (CABN 126569)
3  Chief, Criminal Division

4  MAUREEN BESSETTE (CABN 165775)
   COLIN SAMPSON (CABN 249784)
5  Assistant United States Attorneys

6       450 Golden Gate Avenue, 11th Floor
        San Francisco, California 94102-3495
7       Telephone: (415) 436-7020
        Email: Colin.Sampson@usdoj.gov
8
9  Attorneys for United States of America

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13  IN THE MATTER OF THE           )   No: 3:25-mj-70394-TSH
    EXTRADITION OF:                )
14                                 )   DECLARATION OF COLIN SAMPSON
                                   )   RE DECLARATION OF MAUREEN BESSETTE
15  BAO TU LUU                     )
                                   )
16  ─────────────────────────────  )

17                      **DECLARATION**

18  I, Assistant U.S. Attorney Colin Sampson hereby state:

19  1.  I am an Assistant U.S. Attorney for the Northern District of California and am
20      assigned to the above-entitled extradition matter pursuant to treaty with Australia.[1]

21  2.  On Thursday, August 14, 2025, AUSA Maureen Bessette received an email from the
        United States Department of Justice, Office of International Affairs ("OIA") attaching
22      a PDF copy of Australia's formal extradition request (the "Request").  The Request
        was accompanied by the Declaration of Tim Heinemann, Attorney-Advisor in the
23      Office of Legal Adviser, Department of State.

24  3.  The Request, including the Heinemann Declaration, is Bates-stamped
        "EXT-LUU-00001" through "EXT-LUU-00408."
25

26  ───────────────────────

27  [1] Treaty on Extradition Between the United States of America and Australia, U.S.-Austl., May 14, 1974, 27 U.S.T. 957,
    *as amended by* Protocol Amending the 1974 Extradition Treaty with Australia, U.S.-Austl., Sept. 4, 1990, S. TREATY
28  DOC. NO. 102-23 (1992) (collectively, the "Treaty")

DECLARATION OF
AUSA C. SAMPSON                          1                        3:25-mj-70394-TSH

4. On August 14, 2025, AUSA Bessette forwarded an unredacted copy of the Request to Jay Rorty, then California counsel for Mr. Luu; a redacted copy was filed on August 15, 2025.

5. OIA, in consultation with Australian authorities, requested redactions to the Request (filed on August 15, 2025).

6. Attached hereto as **Attachment A** is a **redacted** copy of the Request and Heinemann Declaration, with personally identifying information, and information deemed sensitive by Australian authorities, redacted prior to filing.

7. Today, August 18, 2025, I forwarded an unredacted copy of the Request and Heinemann Declaration to Mr. Lawrence Schoenbach, pro hac vice counsel for Mr. Luu.[2]

8. I declare the foregoing under penalty of perjury.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: August 18, 2025,                                Respectfully submitted,

                                                        CRAIG H. MISSAKIAN
                                                        United States Attorney

                                                        COLIN SAMPSON
                                                        Assistant U.S. Attorney

---

[2] On August 18, 2025, the Court granted Mr. Jay Rorty's motion to withdraw as counsel for Mr. Luu.  Mr. Rorty was previously local counsel for Mr. Luu's retained, pro hac vice, counsel Mr. Lawrence Shoenbach.

DECLARATION OF
AUSA C. SAMPSON                          2                          3:25-mj-70394-TSH

# ATTACHMENT A

DECLARATION OF TOM HEINEMANN

I, Tom Heinemann, do hereby state as follows:

1.  I am an Attorney-Adviser in the Office of the Legal Adviser, Department of State, Washington, D.C.  This office has responsibility for extradition requests with the Department of State, and I am charged with the extradition case of Bao Tu Luu. I make the following statements based upon my personal knowledge and upon information made available to me in the performance of my official duties.

2.  The relevant and applicable treaty provisions in full force and effect between the United States and Australia are found in the Treaty on Extradition between the United States of America and Australia, of May 14, 1974 (the "1974 Treaty"), and the Protocol Amending the Treaty on Extradition between the United States of America and Australia of May 14, 1974, signed September 4, 1990 (the "1990 Protocol"). Copies of the 1974 Treaty and the 1990 Protocol are attached to this declaration.

3.  Pursuant to the provisions of the Treaty, the Embassy of Australia has submitted Diplomatic Note No. 94/2025, dated August 11, 2025, which formally requested the extradition of Bao Tu Luu. A copy of the Diplomatic Note is attached to this declaration.

4.  In accordance with Article XVIII of the 1974 Treaty, as amended by Article 14 of the 1990 Protocol, the Government of the United States provides legal representation in its courts for Australia in its extradition requests, and Australia provides legal representation in its courts for extradition requests made by the United States.

5.  The offense for which extradition is sought is extraditable offenses pursuant to Article II of the 1974 Treaty, as amended by Article 1 of the 1990 Protocol.

6. The documents submitted by the Government of Australia in support of its extradition requests were certified on August 6, 2025, by Erika Olson, Chargé d'Affaires of the U.S. Embassy in Australia, in accordance with Title 18, United States Code, Section 3190. Chargé d'Affaires Olson, at the time of certification, was the principal diplomatic officer of the United States resident in Australia.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed in Santa Fe, New Mexico on August 13th, 2025

Tom Heinemann

Attachments:

1. Copy of Diplomatic Note
2. Copies of Treaty and Protocol

TREATIES AND OTHER INTERNATIONAL ACTS SERIES 92-1221

## LAW ENFORCEMENT

**Extradition**

**Protocol Between the**
**UNITED STATES OF AMERICA**
**and AUSTRALIA**
**Amending Treaty of May 14, 1974**

Signed at Seoul September 4, 1990



NOTE BY THE DEPARTMENT OF STATE

Pursuant to Public Law 89—497, approved July 8, 1966
(80 Stat. 271; 1 U.S.C. 113)—

". . .the Treaties and Other International Acts Series issued
under the authority of the Secretary of State shall be competent
evidence . . . of the treaties, international agreements other than
treaties, and proclamations by the President of such treaties and
international agreements other than treaties, as the case may be,
therein contained, in all the courts of law and equity and of maritime
jurisdiction, and in all the tribunals and public offices of the
United States, and of the several States, without any further proof
or authentication thereof."

# AUSTRALIA

## Law Enforcement:  Extradition

*Protocol amending treaty of May 14, 1974;*
*Signed at Seoul September 4, 1990;*
*Transmitted by the President of the United States of America*
    *to the Senate February 19, 1992 (Treaty Doc. 102-23,*
    *102d Congress, 2d Session);*
*Reported favorably by the Senate Committee on Foreign Relations*
    *May 7, 1992 (Senate Executive Report No. 102-30,*
    *102d Congress, 2d Session);*
*Advice and consent to ratification by the Senate*
    *May 13, 1992;*
*Ratified by the President October 9, 1992;*
*Notes exchanged at Washington December 21, 1992;*
*Entered into force December 21, 1992.*

PROTOCOL AMENDING THE TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA
AND
AUSTRALIA
OF MAY 14, 1974

The United States of America and Australia;

Desiring to make more effective the Extradition Treaty between
the Contracting Parties signed at Washington May 14, 1974
(hereinafter referred to as "the Treaty");

Have agreed as follows:

ARTICLE I

The text of Article II of the Treaty is replaced by the following:

"(1)  An offence shall be an extraditable offence if it is punishable under the laws in both Contracting Parties by deprivation of liberty of more than one year, or by a more severe penalty.  However, if the request for extradition relates to a person convicted of such an offence who is wanted for the enforcement of a sentence of imprisonment, the executive authority of the requested State shall have authority to refuse extradition if a period of less than six months of imprisonment remains to be served.

(2)  The following offences shall be extraditable if they meet the requirements of paragraph (1): conspiring to commit, attempting to commit, aiding or abetting, counselling or procuring the commission of, or being an accessory after the fact to, any offence described in that paragraph.

(3)  For the purpose of this Article, an offence shall be an extraditable offence:

> (a) whether or not the laws in the Contracting Parties place the offence within the same category of offences or describe the offence by the same terminology; and

(b) whether or not the offence is one for which United States federal law requires proof of interstate transportation, or use of the mails, or of other facilities affecting interstate or foreign commerce, such matters being merely for the purpose of establishing jurisdiction in a United States federal court.

(4) If the offence has been committed outside the territory of the requesting State, extradition shall be granted if the laws in the requested State provide for the punishment of an offence committed outside of its territory in similar circumstances. If the laws in the requested State do not so provide, the executive authority of the requested State may, in its discretion, grant extradition.

(5) Subject to the laws in the requested State, if extradition has been granted for an extraditable offence, it shall also be granted for any other offence specified in the request even if the latter offence is punishable by deprivation of liberty of one year or less, provided that all other requirements of extradition are met."


ARTICLE 2

Article III and Article IV of the Treaty are deleted.

- 4 -

ARTICLE 3

The text of paragraph 2 of Article V of the Treaty is replaced
by the following:

"If the requested State refuses to extradite a national of that
State on the basis of nationality it shall, if the requesting
State so requests and the laws of the requested State allow,
submit the case to the competent authorities in order that
proceedings for the prosecution of the person may be undertaken
in respect of all offences for which the extradition has been
requested."


ARTICLE 4

Article VI of the Treaty is deleted.


ARTICLE 5

The text of Article VIII of the Treaty is replaced by the
following:

"If, under the law of the requesting State, an offence for
which the extradition of a person is requested is subject to a

- 5 -

penalty of death, the requested State may refuse the
extradition unless the requesting State gives an undertaking
that the death penalty will not be imposed or, if imposed, will
not be carried out."


ARTICLE 6


The text of Article IX of the Treaty is replaced by the
following:

    "(1) If the extradition request is granted in the case of a
    person who is being prosecuted or is serving a sentence in
    the territory of the requested State, the requested State
    may temporarily surrender the person sought to the
    requesting State for the purpose of prosecution.  The
    person so surrendered shall be kept in custody in the
    requesting State and shall be returned to the requested
    State after the conclusion of the proceedings against that
    person, in accordance with conditions to be mutually
    determined in writing between the Contracting Parties.
    (2)  The requested State may postpone the extradition
    proceedings against, or the surrender of, any person who is
    being prosecuted or who is serving a sentence in that

- 6 -

State.  The postponement may continue until the prosecution of the person sought has been concluded and any sentence has been served."


ARTICLE 7

The text of Article XI of the Treaty is replaced by the following:

"(1)  All requests for extradition shall be made through the diplomatic channel.

(2)  The request for extradition shall be supported by:

(a) documents, statements, or other types of information which describe the identity and probable location of the person sought;

(b) a description of the conduct constituting the offence;

(c) a statement of the law describing the essential elements of the offence for which extradition is requested; and

(d) a statement of the law describing the punishment for the offence and the law relating to the limitation of legal proceedings.

(3)  A request for the extradition of a person who is sought for prosecution or who has been found guilty in his absence shall also be supported by:

(a) a copy of the warrant or order of arrest issued in the requesting State for the arrest of the person for the offence;

(b) a copy of the charging document, if any; and

(c) a description of the facts, by way of affidavit, statement, or declaration, setting forth reasonable grounds for believing that an offence has been committed and that the person sought committed it.

(4) A request for extradition of a person who has been found guilty of the offence for which extradition is sought, other than a person who has been found guilty in his absence, shall also be supported by:

(a) a copy of the judgment of conviction, if available, or a statement by a judicial authority that the person has been found guilty;

(b) information establishing that the person sought is the person to whom the finding of guilt refers;

(c) a copy of the sentence imposed, if the person has been sentenced, and a statement establishing to what extent the sentence has been carried out; and

(d) if the person has been found guilty but no sentence has been imposed, a statement affirming that it is intended to impose a sentence.

(5) The documents which accompany an extradition request shall be received and admitted as evidence in extradition proceedings if:

    (a) in the case of a request from the United States, they

        (i) purport to be signed or certified by a judge, magistrate, or officer in or of the United States; and

        (ii) purport to be authenticated by the oath or affirmation of a witness or to be sealed with an official or public seal of the requesting State or of a Minister of State, or of a Department or officer of the Government of the requesting State;

    (b) in the case of a request from Australia, they are certified by the principal diplomatic or consular officer of the United States resident in Australia, as provided by the extradition laws of the United States; or

    (c) they are certified or authenticated in any other manner accepted by the law of the requested State."

ARTICLE 8

The text of Article XII of the Treaty is replaced by the following:

- 9 -

"(1)  In case of urgency, either Contracting Party may request the provisional arrest of the person sought pending presentation of the request for extradition.  A request for provisional arrest may be transmitted through the diplomatic channel or directly between the Department of Justice in the United States and the Attorney-General's Department in Australia.  The facilities of the International Criminal Police Organisation (Interpol) may be used to transmit such a request.

(2)  The application for provisional arrest shall contain:

     (a) a description of the person sought;

     (b) the location of the person sought, if known;

     (c) a brief statement of the facts of the case, including, if possible, the time and location of the offence;

     (d) a description of the laws violated or alleged to have been violated and, where applicable, the penalty which may be imposed;

     (e) a statement of the existence of a warrant of arrest or finding of guilt or judgment of conviction against the person sought; and

     (f) a statement that a request for the extradition of the person sought will follow.

(3)  On receipt of the application, the requested State shall take appropriate steps to secure the arrest of the person sought.  The requesting State shall be notified

without delay of the disposition of its application and the
reasons for any denial.

(4)  A person who is provisionally arrested may be
discharged from custody upon the expiration of sixty (60)
days from the date of arrest pursuant to the application of
the requesting State if the executive authority of the
requested State has not received the formal request for
extradition and the supporting documents required in
Article XI.

(5)  The fact that the person sought has been discharged
from custody pursuant to paragraph (4) of this Article
shall not prejudice the subsequent rearrest and extradition
of that person if the extradition request and supporting
documents are received at a later date."


ARTICLE 9


Article XIII of the Treaty is amended by deleting the words
"evidence or" wherever they occur in Article XIII(1) and
Article XIII(2), and by adding the following:

"(4)  If the person sought, after being personally advised
by the competent authority of the requested State of his
right to formal extradition proceedings, consents to

- 11 -

surrender to the requesting State, the requested State may
surrender the person as expeditiously as possible and
without further proceedings."


ARTICLE 10

The text of Article XIV of the Treaty is replaced by the
following:

"(1)  A person extradited under this Treaty may not be
detained, tried, or punished in the requesting State except
for:

> (a) the offence for which extradition is granted
> or any other offence of which the person could be
> convicted on proof of the conduct constituting
> the extradition offence provided that the offence
> carries the same or a lesser punishment;
> (b) any offence committed after the extradition;
> or
> (c) any offence for which the executive authority
> of the requested State consents to the person's
> detention, trial or punishment.  For the purposes
> of this subparagraph, the requested State may
> require the submission of the documents specified
> in Article XI.

(2)  A person extradited under this Treaty by a Contracting
Party may not be extradited to a third State for an offence

- 12 -

committed prior to his surrender unless that Contracting
Party consents.

(3)   Paragraphs (1) and (2) of this Article shall not
prevent the detention, trial, or punishment of an
extradited person, or the extradition of that person to a
third State, if:

> (a) that person leaves the territory of the
> requesting State after extradition and
> voluntarily returns to it; or
>
> (b) that person does not leave the territory of
> the requesting State within fifteen days of the
> day on which the person is free to do so."


ARTICLE 11

The text of Article XV of the Treaty is replaced by the
following:

"If the requested State receives requests from the other
Contracting Party and from any other State or States for the
extradition of the same person, either for the same offence or
for a different offence, the executive authority of the
requested State shall determine to which State it will surrender
the person.  In making its decision, the requested State shall
consider all relevant factors, including but not limited to:

    (a) whether the requests were made pursuant to treaty;

    (b) the place where each offence was committed;

EXT-LUU-00017

- 13 -

(c) the respective interests of the requesting States;

(d) the gravity of the offences;

(e) the nationality of the victim;

(f) the possibility of further extradition between the requesting States; and

(g) the chronological order in which the requests were received from the requesting States."


ARTICLE 12

The text of Article XVI of the Treaty is replaced by the following:

"(1)  The requested State shall promptly notify the requesting State of its decision on the request for extradition.

(2)  If the request is denied in whole or in part, the requested State shall provide information as to the reasons for the denial of the request.  The requested State shall provide copies of pertinent judicial decisions on request.

(3)  If the request for extradition is granted, the competent authorities of the Contracting Parties shall arrange for the time and place of the surrender of the person sought.

(4)  If the person sought is not removed from the territory of the requested State within the time prescribed by the law of that State, that person may be discharged from

custody, and the requested State may subsequently refuse
extradition for the same offences."


ARTICLE 13

The text of Article XVII of the Treaty is replaced by the
following:

"(1)  To the extent permitted under its laws, the requested
State may seize all articles, documents, and evidence
connected with the offence in respect to which extradition
is or is to be sought and surrender those items to the
requesting State if extradition is subsequently granted.
The items mentioned in this Article may be surrendered even
when extradition cannot be effected due to the death,
disappearance, or escape of the person sought.

(2)  The requested State may require that the surrender of
any property be subject to satisfactory assurances from the
requesting State that the property will be returned to the
requested State as soon as practicable.  The requested
State may also defer surrender of any property if it is
needed as evidence in the requested State.

(3)  The rights of third parties in any property shall be
duly respected."

## ARTICLE 14

The text of Article XVIII of the Treaty is replaced by the following:

"(1) The requested State shall advise, assist, and otherwise represent the interests of the requesting State in any proceedings arising out of a request for extradition.

(2) The requesting State shall bear the expenses related to any translation of documents and the transportation of the person surrendered. The requested State shall pay all other expenses incurred in that State by reason of the extradition proceedings.

(3) Neither State shall make any pecuniary claim against the other arising out of the arrest, detention, examination, or surrender of the person sought under this Treaty."

## ARTICLE 15

The text of Article XIX of the Treaty is replaced by the following:

"(1) Either Contracting Party may authorise transportation through its territory of a person surrendered to the other State by a third State. A request for transit shall contain a description of the person being transported and a brief

statement of the facts of the case.  A person in transit shall be held in custody during the period of transit.

(2)  No authorisation is required where air transportation is used and no landing is scheduled on the territory of the other Contracting Party.  If an unscheduled landing occurs on the territory of the other Contracting Party, the other Contracting Party may require the request for transit as provided in paragraph 1.  That Contracting Party shall detain the person being transported until the request for transit is received and the transit is effected, so long as the request is received within 96 hours of the unscheduled landing."

ARTICLE 16

Notwithstanding Article XX of the Treaty, this Protocol shall apply in all cases in which the request for extradition is made after its entry into force regardless of whether the offence was committed before or after that date.

ARTICLE 17

This Protocol shall enter into force on the date on which the Contracting Parties have exchanged written notification that they have complied with their respective requirements for the entry into force of this Protocol.


IN WITNESS WHEREOF, the undersigned, being duly authorised thereto by their respective Governments, have signed this Protocol.


DONE at Seoul, this  4th    day of September, 1990

FOR THE UNITED STATES
OF AMERICA:                              FOR AUSTRALIA:

# AUSTRALIA

## Extradition

*Treaty signed at Washington May 14, 1974;*
*Ratification advised by the Senate of the United States*
*    of America December 1, 1975;*
*Ratified by the President of the United States of*
*    America December 16, 1975;*
*Ratified by Australia December 22, 1975;*
*Ratifications exchanged at Canberra April 8, 1976;*
*Proclaimed by the President of the United States of*
*    America May 5, 1976;*
*Entered into force May 8, 1976.*

―――――

BY THE PRESIDENT OF THE UNITED STATES OF AMERICA

## A PROCLAMATION

CONSIDERING THAT:

The Treaty on Extradition between the United States of America and Australia was signed at Washington on May 14, 1974, the original of which Treaty is hereto annexed;

The Senate of the United States of America by its resolution of December 1, 1975, two-thirds of the Senators present concurring therein, gave its advice and consent to ratification of the Treaty;

The Treaty was ratified by the President of the United States of America on December 16, 1975, in pursuance of the advice and consent of the Senate, and has been duly ratified on the part of Australia;

The respective instruments of ratification were exchanged at Canberra on April 8, 1976;

It is provided in Article XXI of the Treaty that the Treaty shall enter into force thirty days after the exchange of instruments of ratification;

NOW, THEREFORE, I, Gerald R. Ford, President of the United States of America, proclaim and make public the Treaty, to the end that it shall be observed and fulfilled with good faith on and after May 8, 1976, by the United States of America and by the citizens of the United States of America and all other persons subject to the jurisdiction thereof.

(957)                                        TIAS 8234

EXT-LUU-00023

IN TESTIMONY WHEREOF, I have signed this proclamation and caused the Seal of the United States of America to be affixed.

DONE at the city of Washington this fifth day of May in the year of our Lord one thousand nine hundred seventy-six

[SEAL]   and of the Independence of the United States of America the two hundredth.

GERALD R. FORD

By the President:
JOSEPH JOHN SISCO
*Acting Secretary of State*

TIAS 8234

EXT-LUU-00024

TREATY ON EXTRADITION BETWEEN
THE UNITED STATES OF AMERICA AND AUSTRALIA

The United States of America and Australia, desiring to
make more effective the cooperation of the two countries for
the reciprocal extradition of offenders, agree as follows:

TIAS 8234

ARTICLE I

Each Contracting Party agrees, under the conditions and circumstances established by this Treaty, reciprocally to deliver up persons found in its territory who have been charged with or convicted of any of the offenses mentioned in Article II of this Treaty committed within the territory of the other Contracting Party, or outside that territory under the conditions specified in Article IV of this Treaty.

ARTICLE II

(1)  Persons shall be delivered up according to the provisions of this Treaty for any of the following offenses provided these offenses are punishable by the laws of both Contracting Parties by a term of imprisonment exceeding one year or by death:

1.  Murder or willful murder; assault with intent to commit murder.

2.  Manslaughter.

3.  Aggravated or willful wounding or injuring; assault occasioning actual bodily harm.

4.  Unlawful throwing or application of any corrosive or injurious substances upon the person of another.

5.  Rape; indecent assault, including unlawful sexual acts with or upon children.

6.  Illegal abortion.

7.  Procuring, or trafficking in, women or young persons for immoral purposes; living on the earnings of prostitution.

8.  Abandoning or exposing a child when the life of that child is or is likely to be injured or endangered.

EXT-LUU-00026

9.  Bigamy.

10. Kidnapping; child stealing; abduction; false imprisonment.

11. Robbery.

12. Burglary; housebreaking or any similar offense.

13. Larceny.

14. Embezzlement.

15. Obtaining any property, money or valuable securities by false pretenses or other form of deception.

16. An offense against the law relating to bribery.

17. Extortion.

18. Receiving any property, money or valuable securities knowing the same to have been unlawfully obtained.

19. Fraud by an agent, bailee, banker, factor or trustee, by a director or officer of a company or by a promoter of a company, whether existing or not.

20. An offense relating to counterfeiting or forgery.

21. Perjury; subornation of perjury; conspiring to defeat the course of justice.

22. Arson.

23. An act done with the intention of endangering the safety of any person traveling upon a railway or in any aircraft or vessel or other means of transportation.

24. Any seizure or exercise of control, by force or violence or threat of force or violence, or by any other form of intimidation, of an aircraft.

25. Piracy, by statute or by law of nations; revolt on board a vessel against the authority of the master of the vessel.

EXT-LUU-00027

26.  Malicious injury to property.

27.  An offense against the bankruptcy laws.

28.  An offense against the laws relating to narcotics,
dangerous drugs or psychotropic substances.

29.  Dealing in slaves.

(2)  Extradition shall also be granted for any other offenses
that are made extraditable under the extradition laws of Australia
and which are felonies under the laws of the United States of America.

(3)  Extradition shall also be granted for any offense against
a federal law of the United States of America of which one of the
above-mentioned offenses is a substantial element, even if trans-
porting or transportation or the use of the mails or of interstate
facilities is also an element of the specific offense.

(4)  Extradition shall also be granted for aiding, abetting,
counseling or procuring the commission of, being an accessory
before or after the fact to, or attempting or conspiring to commit,
any of the offenses mentioned in the preceding paragraphs of this
Article.

(5)  If extradition is requested for any offense mentioned
in a preceding paragraph of this Article and that offense is
punishable under the laws of both Contracting Parties by a term
of imprisonment exceeding one year or by death, that offense shall
be extraditable under the provisions of this Treaty whether or not
the laws of both Contracting Parties would place that offense within
the same category of offenses made extraditable by that preceding
paragraph of this Article and whether or not the laws of the requested
State denominate the offense by the same terminology.

EXT-LUU-00028

ARTICLE III

(1)  For the purposes of this Treaty, the territory of a Contracting Party means all the territory under the jurisdiction of that Contracting Party, including airspace and territorial waters, and also includes –

(a)  any vessel registered in any territory under the jurisdiction of that Contracting Party; and

(b)  any aircraft registered in any such territory provided that the aircraft is in flight when the relevant offense is committed.

(2)  For the purposes of this Treaty –

(a)  the territory under the jurisdiction of a Contracting Party includes the Territories for the international relations of which that Contracting Party is responsible;

(b)  an aircraft shall be considered in flight from the moment when the power is applied for the purpose of take-off until the moment when the landing run ends.


ARTICLE IV

When the offense for which extradition has been requested has been committed outside the territory of the requesting State –

(a)  if the United States of America is the requested State – the executive authority of the United States of America; or

(b)  if Australia is the requested State – the Attorney-General of Australia,

shall have the power to grant the extradition if the laws of the requested State provide for jurisdiction over such an offense committed in similar circumstances.


TIAS 8234

ARTICLE V

(1)  Neither of the Contracting Parties shall be bound to deliver up its own nationals under this Treaty but the executive authority of each Contracting Party shall have the power to deliver them up if, in its discretion, it considers that it is proper to do so.

(2)  For the purposes of this Article –

(a)  a reference to the executive authority of a Contracting Party shall, in the case of Australia, be construed as a reference to the Attorney-General of Australia;

(b)  Australian protected persons shall be deemed to be nationals of Australia; and

(c)  the nationality of a person shall be determined to be that which he held at the time when he was charged with the offense for which his extradition is requested.

ARTICLE VI

Extradition shall be granted only if the evidence is found sufficient, according to the laws in the territory where the person whose extradition is requested is found, either to justify his trial or committal for trial if the offense with which he is charged or its equivalent had been committed in that territory or to prove that he is the identical person convicted by the courts of the requesting State.

TIAS 8234

ARTICLE VII

(1)  Extradition shall not be granted in any of the following circumstances:

(a)  when the person whose extradition is requested is being proceeded against, has been tried and discharged or punished, or has been pardoned, in the territory of the requested State for the offense for which his extradition is requested;

(b)  when the prosecution for the offense has become barred by lapse of time according to the laws of the requesting State; or

(c)  when the offense in respect of which extradition is requested is of a political character, or the person whose extradition is requested proves that the extradition request has been made for the purpose of trying or punishing him for an offense of a political character.

(2)  If any question arises whether a case comes within the provisions of subparagraph (c) of paragraph (1) of this Article, the requested State shall decide that question.


ARTICLE VIII

If, under the law of the requesting State, an offense for which the extradition of a person is requested, or any other offense for which he may be detained or tried under paragraph (1) of Article XIV, is subject to a penalty of death but the law of the requested State does not provide for such a penalty in a similar case, the requested State may recommend to the requesting State that any punishment imposed for any of those offenses be a less severe punishment.

TIAS 8234

### ARTICLE IX

When the person whose extradition is requested is being proceeded against or is serving a sentence in the territory of the requested State for an offense other than that for which extradition has been requested, his surrender may be deferred until the conclusion of the proceedings and the full execution of any punishment that may be or may have been imposed on him.

### ARTICLE X

The determination that extradition based upon the request therefor should or should not be granted shall be made in accordance with the law of the requested State and the person whose extradition is sought shall have the right to use such remedies and recourses as are provided by that law.

### ARTICLE XI

(1)  The request for extradition shall be made through the diplomatic channel.

(2)  The request shall be accompanied by a description of the person sought, a statement of the facts of the case, the text of the applicable laws of the requesting State including the law defining the offense, the law prescribing the punishment for the offense and the law relating to the limitation of the legal proceedings.

(3)  When the request relates to a person who has not yet been convicted, it must also be accompanied by a warrant of arrest issued by a judge or other judicial officer of the requesting State and by such evidence as, according to the laws of the requested State,

TIAS 8234

would justify his trial or committal for trial if the offense had been committed there, including evidence proving the person requested is the person to whom the warrant of arrest refers.

(4)  When the request relates to a person already convicted, it must be accompanied by the judgment of conviction and sentence, if any, passed upon him in the territory of the requesting State, by a statement, if applicable, showing how much of the sentence has not been served and by evidence proving that the person requested is the person to whom the judgment refers.

(5)  The warrant of arrest and deposition or other evidence, given under oath or affirmed, and the judicial documents establishing the existence of the conviction, or certified copies of those documents, shall be admitted in evidence in the examination of the request for extradition when -

> (a)  in the case of a request by Australia - those documents or certified copies bear the signature, or are accompanied by the attestation, of a judge, magistrate or officer of Australia or are authenticated by the official seal of the Attorney-General and, in any case, are certified by the principal diplomatic or consular officer of the United States of America in Australia; or

> (b)  in the case of a request by the United States of America - the warrant, if any, bears an original signature, or the other documents are certified, by a judge, magistrate or officer of the United States of America and, in any case, are authenticated by the oath of a witness or sealed with the official

EXT-LUU-00033

seal of the Department of State on behalf of the Secretary of
State or of the Department of Justice on behalf of the
Attorney General.

### ARTICLE XII

(1)  In case of urgency a Contracting Party may apply for the
provisional arrest of the person sought pending the presentation of
the request for extradition through the diplomatic channel.

(2)  The application shall contain a description of the person
sought, an indication of intention to request the extradition of
the person sought and a statement of the existence of a warrant of
arrest or a judgment of conviction against that person, and such
further information, if any, as would be necessary to justify the
issue of a warrant of arrest had the offense been committed, or the
person sought been convicted, in the territory of the requested
State.

(3)  On receipt of such an application the requested State
shall take the necessary steps to secure the arrest of the person
claimed.

(4)  A person arrested upon such an application shall be set at
liberty upon the expiration of forty-five days from the date of his
arrest if a request for his extradition accompanied by the documents
specified in Article XI has not been received.

(5)  Paragraph (4) of this Article shall not prevent the
institution of proceedings with a view to extraditing the person
sought if the request is subsequently received.

TIAS 8234

ARTICLE XIII

(1)  If the requested State requires additional evidence or information to enable it to decide on the request for extradition, that State may request that such evidence or information be furnished within such period as it specifies.

(2)  If the person sought is under arrest and the additional evidence or information submitted as aforesaid is not sufficient or if such evidence or information is not received within the period specified by the requested State, he shall be discharged from custody.

(3)  The discharge of a person from custody under paragraph (2) of this Article shall not bar the requesting State from submitting another request in respect of the same offense.

ARTICLE XIV

(1)  A person extradited under this Treaty may be detained, tried or punished in the territory of the requesting State for any offense mentioned in Article II for which the person could be convicted upon proof of the facts upon which the request for extradition was based.

(2)  Except as provided in paragraph (1) of this Article, a person extradited under this Treaty shall not be detained, tried or punished in the territory of the requesting State for an offense other than that for which extradition has been granted, or be extradited by that State to a third State, unless -

(a)  he has left the territory of the requesting State after his extradition and has voluntarily returned to it;

TIAS 8234

EXT-LUU-00035

970      *U.S. Treaties and Other International Agreements*      [ 27 UST

(b)  he has not left the territory of the requesting State within thirty days after being free to do so; or

(c)  the offense concerned is one for which the requested State has consented to his detention, trial or punishment or to his extradition to a third State and is an offense mentioned in Article II.

(3)  A request for the consent of the requested State under subparagraph (c) of paragraph (2) of this Article shall be accompanied by such information and documents as are requested by that State.

(4)  This Article does not apply to offenses committed after the extradition.

ARTICLE XV

A requested State, upon receiving two or more requests for the extradition of the same person either for the same offense, or for different offenses, shall determine to which of the requesting States it will extradite the person sought, taking into consideration the circumstances and particularly the possibility of a later extradition between the requesting States, the seriousness of each offense, the place where the offense was committed, the nationality and residence of the person sought, the dates upon which the requests were received and the provisions of any extradition agreements between the requested State and the other requesting State or States.

EXT-LUU-00036

ARTICLE XVI

(1)  The requested State shall promptly communicate to the requesting State through the diplomatic channel the decision on the request for extradition.

(2)  Where extradition of a person for an offense is granted, the person shall be conveyed by the appropriate authorities of the requested State to a port or airport in the territory of that State agreed between that State and the requesting State.

(3)  If a warrant or order for the extradition of a person sought has been issued by the competent authority and he is not removed from the territory of the requested State within such time as is prescribed by the laws of that State, he may be set at liberty, and the requested State may subsequently refuse to extradite that person for the same offense.

(4)  Australia is not required to extradite a person before the expiration of fifteen days after the date on which he has been held judicially to be liable to extradition, or, if proceedings for a writ of habeas corpus have been brought, before the expiration of fifteen days after the final decision of the competent court has been given.

ARTICLE XVII

(1)  To the extent permitted under the law of the requested State and subject to the rights of third parties, which shall be duly respected, all articles found in the requested State that have been acquired as a result of the offense or may be required as evidence shall, if the requesting State so requests, be surrendered if extradition is granted.

**TIAS 8234**

(2)  Subject to the qualifications of paragraph (1) of this
Article, the above-mentioned articles shall, if the requested State
so requests, be surrendered to the requesting State even if the
extradition, having been agreed to, cannot be carried out owing
to the death or escape of the person sought.

(3)  Where the law of the requested State or the rights of
third parties so require, any articles so surrendered shall be
returned to the requested State free of charge if that State so
requests.

ARTICLE XVIII

(1)  Expenses related to the transportation of the person sought
to the requesting State shall be paid by the requesting State.

(2)  The requested State shall make all necessary arrangements
for, and meet the cost of, the representation of the requesting State
in any proceedings arising out of a request for extradition.

(3)  No pecuniary claim, arising out of the arrest, detention,
examination and surrender of persons sought under the terms of this
Treaty, shall be made by the requested State against the requesting
State.

ARTICLE XIX

(1)  The right to transport through the territory of one of the
Contracting Parties a person surrendered to the other Contracting
Party by a third State shall be granted on request made through
the diplomatic channel.

(2)  In the case of a national of the requested State, the
request shall establish that conditions are present which would
warrant extradition of the person by the State of transit.

TIAS 8234

(3)  The request may be refused if reasons of public order are opposed to the transit.

(4)  Permission for the transit of a person surrendered shall include authorization for accompanying officials to hold that person in custody or request and obtain assistance from authorities in the State of transit in maintaining custody.

(5)  The Party to which the person has been extradited shall reimburse the Party through whose territory such person is transported for any expenses incurred by the latter in connection with such transportation.

ARTICLE XX

This Treaty applies to offenses mentioned in Article II committed before, on or after the date on which this Treaty enters into force, provided that no extradition shall be granted for an offense committed before that date which was not an offense under the laws of both Contracting Parties at the time of its commission.

ARTICLE XXI

(1)  This Treaty is subject to ratification and the instruments of ratification shall be exchanged in Canberra as soon as possible.

(2)  This Treaty shall enter into force thirty days after the exchange of instruments of ratification. [1]

(3)  This Treaty may be terminated by either Contracting Party giving notice of termination to the other Contracting Party at any time and the termination shall be effective six months after the date of receipt of such notice.

(4)  This Treaty shall terminate and replace, as between the Contracting Parties to the present Treaty, the Treaty on Extradition between the United States and Great Britain of December 22, 1931, [2] as made applicable to Australia.

---

[1] May 8, 1976.
[2] TS 849; 47 Stat. 2122.

TIAS 8234

EXT-LUU-00039

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE at Washington this fourteenth day of May, 1974.

FOR THE UNITED STATES OF AMERICA:

FOR AUSTRALIA:

TIAS 8234

EXT-LUU-00040

L/LEI

AUG 11 P 10:

DEPARTMENT OF ST

No. 94/2025

The Embassy of Australia presents its compliments to the Government of the United States of America and has the honour to present a request for the extradition of Mr Bao Tu Luu, a dual citizen of Vietnam and the United States born on ███████████. Australian authorities note that this request relates to the provisional arrest of Bao Tu Luu which occurred on 20 June 2025.

The extradition of Bao Tu LUU is sought so that he may face prosecution in Australia for the following offence:

- one count of conspiracy to import a commercial quantity of a border controlled drug contrary to ss 11.5(1) and 307.1(1) of the Criminal Code Act (Cth)

The above offence is punishable under Australian law by imprisonment for greater than one year.

This request is made in accordance with the *Treaty on Extradition between Australia and the United States of America* done at Washington on 14 May 1974 as amended by the *Protocol on the Treaty on Extradition between Australia and the United States of America* done at Seoul on 4 September 1990 (collectively 'the Treaty'). The duly authenticated documentation required in support of the extradition request is enclosed.

Australian authorities note that the information provided in support of the extradition request for Bao Tu Luu has been provided for the purposes of facilitating the consideration of Australia's request for Bao Tu Luu's extradition, and the information should not be used for any other purpose without obtaining prior agreement from Australian authorities.

The following Australian official may be contacted in connection with this request for extradition:

████████████████
International Crime Cooperation Central Authority
Attorney-General's Department
3 -5 National Circuit
BARTON ACT 2600
AUSTRALIA
Email:███████████████

Telephone: █████████████

The Australian Government thanks the United States of America in advance for its consideration of this request and avails itself of this opportunity to renew to the United States of America the assurances of its highest consideration.



Washington

11 August 2025

U.S. Department of State

## CERTIFICATE TO BE ATTACHED TO DOCUMENTARY
## EVIDENCE ACCOMPANYING REQUISITIONS IN
## THE UNITED STATES FOR EXTRADITION
## AMERICAN FOREIGN SERVICE

Canberra, Australia
Place and Date *(mm-dd-yyyy)*

rika Olson                          ,     Chargé d' Affaires
         Name                                            Title

of th    ed States of America at        Canberra, Australia

here     ify that the annexed papers, being     official documents provided by the Government of Australia

prop     be used upon an application for the extradition from the United States of America

Bao

charg    the crime of     one count of conspiracy to import a commercial quantity of a border controlled drug contrary

to ss     nd 307.1(1) of the Criminal Code Act (Cth)

allege     e been committed in     the Commonwealth of Australia

are pr    d legally authenticated so as to entitle them to be received in evidence for similar purposes by

the trib     the Commonwealth of Australia                                                        ,

as req    itle 18, United States Code, Section 3190.

I      whereof I hereunto sign my name and cause my seal of office to be affixed

th     sixth     day of     August     2025
                                        Month and Year

Signature

Erika Olson, Chargé d' Affaires, U.S. Embassy Canberra
Type Name and Title of Certifying Officer
of the United States of America.

DS-0036
08-2019

SBU - LEGAL



I, Brittany Cole, Acting Assistant Secretary of the International Crime Cooperation Central Authority, International and Security Cooperation Division, Attorney-General's Department, an officer in and of the Commonwealth of Australia, hereby certify that the documents attached to this certificate relate to the Commonwealth of Australia's request to the United States of America for Mr Bao Tu LUU

AND

I further certify that the seal affixed to this certificate is the seal of the Attorney-General of the Commonwealth of Australia, who is a Minister of State of the Commonwealth of Australia

AND

I further certify that the above-mentioned seal of the Attorney-General authenticates everything attached to this certificate.

Given under my hand and the official seal of the Attorney-General of the Commonwealth of Australia affixed to the tape binding all the attached documents.



BRITTANY COLE
Acting Assistant Secretary
International Crime Cooperation Central Authority
International and Security Cooperation Division
Attorney-General's Department
an officer in and of the Commonwealth of Australia

SBU - LEGAL



## REQUEST FOR THE EXTRADITION TO AUSTRALIA OF

## BAO TU LUU FROM THE UNITED STATES OF AMERICA

I, the Honourable Michelle Rowland MP, Attorney-General, a Minister of State of the Commonwealth of Australia, on behalf of the Government of Australia, hereby request that Bao Tu LUU, who is accused in the Commonwealth of Australia, of the following offence:

- one count of conspiracy to import a commercial quantity of a border controlled drug contrary to sections 11.5(1) and 307.1(1) of the *Criminal Code Act 1995* (Cth)

be returned to Australia to be dealt with according to law.

Dated this   *15th*   day of   *July*   2025

THE HON MICHELLE ROWLAND
ATTORNEY-GENERAL

SBU - LEGAL

REQUEST FOR THE EXTRADITION OF

BAO TU LUU (also known as 'CHRIS', 'Big Brother')

FROM THE UNITED STATES OF AMERICA

TO AUSTRALIA


AFFIDAVIT OF PROSECUTOR

On the 25th day of July 2025, I, Ha Eun Hwang, of Level 14, 181 William Street, Melbourne, in the State of Victoria make oath and say:

1.  I am employed as a Federal Prosecutor in the Melbourne Office of the Director of Public Prosecutions for the Commonwealth of Australia. Subject to the direction and control of the Director, I am responsible for the prosecution of Bao Tu LUU (**LUU**) for the offence referred to below.

    **Qualifications of the deponent**

2.  I was admitted to practice as a solicitor of the Supreme Court of Victoria in 2017.

3.  I have been employed as a solicitor in the Office of the Commonwealth Director of Public Prosecutions since 2023. My duties include the prosecution of persons charged with offences against the laws of the Commonwealth, including but not limited to offences against the *Criminal Code* (Cth) (**Criminal Code**). Based on my training and experience, I am well acquainted with the provisions of the Code and other laws of the Commonwealth and the State of Victoria relating to criminal law and procedure.

**Offence for which surrender is sought**

4.  The extradition of LUU from the United States of America (**USA**) to Australia is sought for prosecution for the following offence (the offence):

    (a) Conspiracy to import a commercial quantity of a border controlled drug, namely cocaine, contrary to sections 11.5(1) and 307.1(1) of the Criminal Code between about 21 September 2016 and 29 June 2017.

5.  Bao Tu are the given names of the person whose surrender is sought and LUU is his family name. That person is hereafter referred to as LUU. LUU is also sometimes referred to as 'Chris' and 'Big Brother'.

2

### Warrant for arrest of BAO TU LUU

6.  On 29 March 2019, a Magistrate of the Melbourne Magistrates' Court issued a warrant for the arrest of LUU in respect of the above offence. This warrant was revoked on 31 March 2025 due to a typographical error.

7.  On 2 April 2025, a Magistrate of the Melbourne Magistrates' Court re-issued a warrant for the arrest of LUU in respect of the same offence. The warrant remains in force as at the date of this affidavit. A true copy of the warrant is annexed to the affidavit of Nicholas PETRECCA (**Investigator's Affidavit**).

### Acts and omissions constitute the offence

8.  The prosecution alleges that, between September 2016 and June 2017, LUU conspired with Minh Tan LE, Steven Truong, Van Hieu LE, Barry HO and others (**co-conspirators**), to import about 78 kilograms of cocaine (59.206 kilograms pure) which was to be sent in a shipping container by sea from South America to Australia, specifically to the Port of Melbourne, Australia, to arrive on 26 June 2017.

9.  A detailed statement of the conduct alleged against LUU in respect of the offence is set out in the Investigator's Affidavit dated 24 July 2025, supported by witness statements and other evidence including the Blackberry Photobook referred to in the Investigator's Affidavit and contained in the request for extradition.

10. It is my opinion that the acts and omissions alleged in respect of LUU, as set out in the Investigator's Affidavit, constitute an offence against sections 11.5(1) and 307.1(1) of the Criminal Code, the elements of which are referred to in this affidavit.

### Offence provisions

11. Set out below are relevant statutory provisions relating to the offence.

12. Section 11.5(1) of the Criminal Code provides:

> *(1)  A person who conspires with another person to commit an offence punishable by imprisonment for more than 12 months, or by a fine of 200 penalty units or more, commits the offence of conspiracy to commit that offence and is punishable as if the offence to which the conspiracy relates had been committed.*

> *(2) For the person to be guilty:*

>> *(a) the person must have entered into an agreement with one or more other persons; and*

>> *(b) the person and at least one other party to the agreement must have intended that an offence would be committed pursuant to the agreement; and*

>> *(c) the person or at least one other party to the agreement must have*

SBU LEGAL
EXT-LUU-000-47

*committed an overt act pursuant to the agreement.*

13.   Section 307.1(1) of the Criminal Code provides:

*(1) A person commits an offence if:*

*(a) the person imports or exports a substance; and*

*(b) the substance is a border controlled drug or border controlled plant; and*

*(c) the quantity imported or exported is a commercial quantity.*

*Penalty: Imprisonment for life or 7,500 penalty units, or both.*

14.   As per section 300.2 of the Criminal Code, a "border controlled drug" has the meaning given by section 301.4. Section 301.4 provides that:

*(1) A border controlled drug is a substance, other than a growing plant, that is:*

*(a) listed by a regulation as a border controlled drug; or*

*(b) a drug analogue of a listed border controlled drug; or*

*(c) determined by the AFP Minister as a border controlled drug under section 301.13 (which deals with emergency determinations of serious drugs).*

15.   Cocaine is listed as a border controlled drug in Schedule 2 of the Criminal Code Regulations 2019 (Cth) (**Criminal Regulations**). Item 43 of the said regulation stipulates the commercial quantity of cocaine as 2 kilograms pure.

16.   An authorised version of sections 11.5(1), 300.2, 301.4, and 307.1(1) of the Criminal Code, and item 43 of Schedule 2 of the Criminal Regulations is exhibited hereto and marked "**Exhibit A**".

**Extraterritorial application of relevant offence provisions**

17.   Section 300.3 of the Criminal Code provides section 15.2 (extended geographical jurisdiction--category B) applies to each offence against this Part (this Part being Division 300 and includes the offence for which LUU has been charged).

18.   Section 15.2 of the Criminal Code allows for extended geographical jurisdiction where conduct constituting the alleged offence occurs wholly or partly in Australia, or where the alleged offence is an ancillary offence and the conduct constituting the alleged offence occurs wholly outside Australia and the conduct constituting the primary offence to which the ancillary offence relates, or a result of that conduct occurs, or is intended by the person to occur, wholly or partly in Australia.

19.   A conspiracy charge contrary to section 11.5 of the Criminal Code is an ancillary offence, as per the Criminal Code's Dictionary.

SBU - LEGAL

4

20.  Given that some of the overt acts of the co-conspirators were committed in the State of Victoria in Australia and the drugs were intended for and arrived in Australia, section 15.2 of the Criminal Code applies to extend the geographical jurisdiction of the offence charged against LUU.

21.  An authorised version of sections 15.2, 300.3 and extract of definition of 'ancillary offence' of the Criminal Code is exhibited hereto and marked "**Exhibit B**".

## Statement of the penalty that can be imposed for the offence

22.  The following penalty applies in respect of the offence charged against LUU.

23.  Section 307.1(1) of the Criminal Code provides:

   *Penalty: Imprisonment for life or 7,500 penalty units, or both.*

## Elements of the offence

24.  The elements constituting the offence charged are as follows:

   a.  The defendant agreed with one or more other persons to import a border controlled drug;[1]

   b.  The defendant intended to enter into that agreement;[2]

   c.  The defendant and at least one other person: [3]

      i.   intended that a substance would be imported pursuant to that agreement;
      ii.  intended that the substance to be imported pursuant to that agreement would be a border controlled drug;

   d.  The substance to be imported pursuant to that agreement would be of a commercial quantity;[4] and

   e.  The defendant, or at least one other party to the agreement, committed an overt act pursuant to the agreement.

## Evidence demonstrating reasonable grounds to believe that LUU committed the offence

25.  It is my opinion that the detailed statement of conduct set out in the Investigator's Affidavit sets forth reasonable grounds for believing that the offence referred to in the arrest warrant, the elements of which are set out above, were committed by LUU.

---

[1]   See Investigator's Affidavit, notably [18]-[20].
[2]   Ibid, [22]-[42].
[3]   Ibid, notably [40]-[42], [46], [48].
[4]   Ibid, notably [46], [51].

**Statement of time limit on the institution of proceedings for the offence**

26. Section 15B(1)(a) of the *Crimes Act 1914* (Cth) (**Crimes Act**) provides:

> (1) *Subject to subsection (1B), a prosecution of an individual for an offence against any law of the Commonwealth may be commenced as follows:*
>
> > (a) *if the maximum penalty which may be imposed for the offence in respect of an individual is, or includes, a term of imprisonment of more than 6 months in the case of a first conviction--at any time*

27. Subsection 1B of the Crimes Act relates to offences committed by virtue of section 11.2 or 11.2A (aiding and abetting) of the Criminal Code and as such, does not apply to this matter.

28. Therefore, there is no time limit on the institution of proceedings for the offence charged against LUU.

29. An authorised version of section 15B of the Crimes Act is exhibited hereto and marked "**Exhibit C**".

**Trial of co-conspirators**

30. Between 2017 and 2021, several of the co-conspirators pleaded guilty and were sentenced for their involvement in the conspiracy with LUU (and an earlier conspiracy).

31. The co-conspirators were sentenced as per the table below.

| Name | Offence Provision | Sentence Date | Sentence |
|---|---|---|---|
| Van Hieu **LE** | Charge 1: sections 11.5(1) and 307.1(1) of the Criminal Code.<br><br>Charge 2: sections 11.5(1) and 307.1(1) Criminal Code.<br><br>Together with sections 11.2A and 307.2(1) and sections 11.2 and 302.2(1) of the Criminal Code on a section 16BA Schedule. | 29 November 2021 | Charge 1: 13 years imprisonment.<br><br>Charge 2: 14 years imprisonment.<br><br>Total effective sentence: 17 years imprisonment. |

| Name | Offence Provision | Sentence Date | Sentence |
|------|-------------------|---------------|----------|
| Barry **HO** | Charge 1: sections 11.5(1) and 307.1(1) of the Criminal Code.<br><br>Charge 2: sections 11.5(1) and 307.1(1) Criminal Code. | 29 November 2021 | Charge 1: 11 years and 6 months imprisonment.<br><br>Charge 2: 12 years and 6 months imprisonment.<br><br>Total effective sentence: 14 years and 9 months imprisonment. |
| Tan Phuc **LY** | Charge 1: sections 11.5(1) and 307.1(1) of the Criminal Code. | 10 February 2021 | Charge 1: 9 years and 8 months imprisonment. |
| Dong Vinh **TRAN** | Charge 1: sections 11.5(1) and 307.1(1) of the Criminal Code. | 10 February 2021 | Charge 1: 9 years and 8 months imprisonment. |
| Phan Tuan "Tommy" **PHAM** | Charge 1: sections 11.5(1) and 307.1(1) of the Criminal Code. | 10 February 2021 | Charge 1: 9 years and 8 months imprisonment. |

**Double jeopardy**

32.    LUU has not previously been charged with the offence and he is not entitled to be discharged under any rule of law relating to previous acquittal or conviction

Sworn by the Deponent Ha Eun HWANG
at Melbourne in the State of Victoria
on the 25th day of July 2025

_____
Deponent

Before me:

_____

Magistrate/ ~~Court Registrar~~ of the State of Victoria

WILLIAM PARKER

Magistrate William Parker
713

IN THE MATTER OF
THE EXTRADITION FROM THE UNITED STATES OF AMERICA TO
AUSTRALIA OF BAO TU LUU

### CERTIFICATE IDENTIFYING EXHIBIT

This is the exhibit marked '**Exhibit A**' now produced and shown to  _WILLIAM  PARKER_

at the time of swearing this affidavit on 25 July 2025.


*Signature of deponent*


Before me,


*Signature and details of authorised affidavit taker*

_MAGISTRATE  WILLIAM  PARKER_


'Exhibit A'


Exhibit description: Sections 11.5(1), 300.2, 301.4, and
307.1(1) of the Criminal Code, and item 43 of Schedule 2 of the
Criminal Regulations.

SBU - LEGAL

The Criminal Code  **Schedule**
General principles of criminal responsibility  **Chapter 2**
Extensions of criminal responsibility  **Part 2.4**
**Division 11**

Section 11.5

### 11.5  Conspiracy

(1) **A person who conspires with another person to commit an offence punishable by imprisonment for more than 12 months, or by a fine of 200 penalty units or more, commits the offence of conspiracy to commit that offence and is punishable as if the offence to which the conspiracy relates had been committed.**

Note:    Penalty units are defined in section 4AA of the *Crimes Act 1914*.

(2) For the person to be guilty:

(a) the person must have entered into an agreement with one or more other persons; and

(b) the person and at least one other party to the agreement must have intended that an offence would be committed pursuant to the agreement; and

(c) the person or at least one other party to the agreement must have committed an overt act pursuant to the agreement.

(2A) Subsection (2) has effect subject to subsection (7A).

(3) A person may be found guilty of conspiracy to commit an offence even if:

(a) committing the offence is impossible; or

(b) the only other party to the agreement is a body corporate; or

(c) each other party to the agreement is at least one of the following:

(i) a person who is not criminally responsible;

(ii) a person for whose benefit or protection the offence exists; or

(d) subject to paragraph (4)(a), all other parties to the agreement have been acquitted of the conspiracy.

(4) A person cannot be found guilty of conspiracy to commit an offence if:

(a) all other parties to the agreement have been acquitted of the conspiracy and a finding of guilt would be inconsistent with their acquittal; or

(b) he or she is a person for whose benefit or protection the offence exists.

---

*Criminal Code Act 1995*                                    29

Authorised Version C2021C00183 registered 20/04/2021

SBU - LEGAL

Schedule  The Criminal Code
Chapter 2  General principles of criminal responsibility
Part 2.4  Extensions of criminal responsibility
Division 11

## Section 11.6

(5) A person cannot be found guilty of conspiracy to commit an offence if, before the commission of an overt act pursuant to the agreement, the person:

    (a) withdrew from the agreement; and

    (b) took all reasonable steps to prevent the commission of the offence.

(6) A court may dismiss a charge of conspiracy if it thinks that the interests of justice require it to do so.

(7) Any defences, procedures, limitations or qualifying provisions that apply to an offence apply also to the offence of conspiracy to commit that offence.

(7A) Any special liability provisions that apply to an offence apply also to the offence of conspiracy to commit that offence.

(8) Proceedings for an offence of conspiracy must not be commenced without the consent of the Director of Public Prosecutions. However, a person may be arrested for, charged with, or remanded in custody or on bail in connection with, an offence of conspiracy before the necessary consent has been given.

Authorised Version C2021C00183 registered 20/04/2021

SBU – LEGAL

Case 3:25-mj-70394-TSH    Document 21    Filed 08/18/25    Page 58 of 111

The Criminal Code  **Schedule**
Dangers to the community  **Chapter 9**
Serious drug offences  **Part 9.1**
Preliminary  **Division 300**

Section 300.1

# Chapter 9—Dangers to the community

## Part 9.1—Serious drug offences

### Division 300—Preliminary

**300.2  Definitions**

In this Part:

***border controlled drug***:

(a) means a substance that is a border controlled drug within the meaning of subsection 301.4(1); and

(b) to avoid doubt, includes a substance that is, under subsection 301.4(2), (3) or 301.13(1A), taken, for the purposes of this Part, to be a border controlled drug only in relation to particular offences against this Part or particular elements of those offences.

Authorised Version C2025C00060 registered 08/02/2025
SBU – LEGAL

**Schedule** The Criminal Code
**Chapter 9** Dangers to the community
**Part 9.1** Serious drug offences
**Division 301** Serious drugs and precursors

Section 301.3

## 301.4  Meaning of *border controlled drug*

(1)  A ***border controlled drug*** is a substance, other than a growing plant, that is:

    (a)  listed by a regulation as a border controlled drug; or

    (b)  a drug analogue of a listed border controlled drug; or

    (c)  determined by the AFP Minister as a border controlled drug under section 301.13 (which deals with emergency determinations of serious drugs).

Note 1:  Some conditions must be satisfied before:

    (a)  a regulation can be made for paragraph (a) (see section 301.7); or

    (b)  a determination can be made for paragraph (c) (see subsection 301.13(2)).

Note 2:  For the meaning of ***drug analogue***, see section 301.9.

(2)  However:

---

Authorised Version C2025C00060 registered 08/02/2025

SBU - LEGAL

The Criminal Code **Schedule**
Dangers to the community **Chapter 9**
Serious drug offences **Part 9.1**
Serious drugs and precursors **Division 301**

Section 301.5

(a) the regulations may provide that a listed border controlled drug is taken, for the purposes of this Part, to be a border controlled drug only in relation to particular offences against this Part, or particular elements of those offences; and

(b) if the regulations so provide, then the listed border controlled drug is taken, for the purposes of this Part, to be a border controlled drug only in relation to those offences or elements.

(3) To avoid doubt, if a listed border controlled drug is taken, for the purposes of this Part, to be a border controlled drug only in relation to particular offences against this Part, or particular elements of those offences, then a drug analogue of the listed border controlled drug is taken, for the purposes of this Part, to be a border controlled drug only in relation to those offences or elements.

Authorised Version C2025C00060 registered 08/02/2025
SBU – LEGAL

Case 3:25-mj-70394-TSH    Document 21    Filed 08/18/25    Page 61 of 111

The Criminal Code  **Schedule**
Dangers to the community  **Chapter 9**
Serious drug offences  **Part 9.1**
Import-export offences  **Division 307**

Section 307.1

## Division 307—Import-export offences

## Subdivision A—Importing and exporting border controlled drugs or border controlled plants

### 307.1  Importing and exporting commercial quantities of border controlled drugs or border controlled plants

(1)  A person commits an offence if:

    (a)  the person imports or exports a substance; and

    (b)  the substance is a border controlled drug or border controlled plant; and

    (c)  the quantity imported or exported is a commercial quantity.

Penalty:  Imprisonment for life or 7,500 penalty units, or both.

(2)  The fault element for paragraph (1)(b) is recklessness.

(3)  Absolute liability applies to paragraph (1)(c).

Rectified Authorised Version registered 18/05/2021 C2021C00183
EXT_LUU-00656
SBU - LEGAL

Clause 1

# Schedule 2—Border controlled drugs

Note:     See section 14.

## 1  Border controlled drugs and quantities

(1)  The following table lists substances that are border controlled drugs and the quantities of those drugs that are commercial quantities and marketable quantities.

Note:     A drug analogue of a substance listed in the table is also a border controlled drug (see paragraph 301.4(1)(b) of the Code).

| | Border controlled drugs and quantities | | |
|---|---|---|---|
| Item | Border controlled drug | Commercial quantity (kilograms) | Marketable quantity (grams) |

Authorised Version F2025C00225 registered 11/03/2025
SBU - LEGAL

Schedule 2 Border controlled drugs

## Clause 1

### Border controlled drugs and quantities

| Item | Border controlled drug | Commercial quantity (kilograms) | Marketable quantity (grams) |
|------|------------------------|--------------------------------|----------------------------|
| 43 | Cocaine | 2.0 | 2.0 |

*Criminal Code Regulations 2019*

Compilation date: 01/03/2025

Authorised Version F2025C00225 registered 11/03/2025

SBU – LEGAL

IN THE MATTER OF
THE EXTRADITION FROM THE UNITED STATES OF AMERICA TO
AUSTRALIA OF BAO TU LUU

### CERTIFICATE IDENTIFYING EXHIBIT

This is the exhibit marked '**Exhibit B**' now produced and shown to _WILLIAM PARKER_

at the time of swearing this affidavit on 25 July 2025.

_Signature of deponent_

Before me,

_Signature and details of authorised affidavit taker_

MAGISTRATE WILLIAM PARKER

'Exhibit B'

Exhibit description: Sections 15.2, 300.3 and extract of
definition of 'ancillary offence' of the Criminal Code.

SBU - LEGAL

**Schedule** The Criminal Code
**Chapter 2** General principles of criminal responsibility
**Part 2.7** Geographical jurisdiction
**Division 15** Extended geographical jurisdiction

Section 15.2

### 15.2 Extended geographical jurisdiction—category B

(1) If a law of the Commonwealth provides that this section applies to a particular offence, a person does not commit the offence unless:

    (a) the conduct constituting the alleged offence occurs:

        (i) wholly or partly in Australia; or

        (ii) wholly or partly on board an Australian aircraft or an Australian ship; or

    (b) the conduct constituting the alleged offence occurs wholly outside Australia and a result of the conduct occurs:

        (i) wholly or partly in Australia; or

        (ii) wholly or partly on board an Australian aircraft or an Australian ship; or

Authorised Version C2025C00060 registered 08/02/2025

SBU - LEGAL

Case 3:25-mj-70394-TSH    Document 21    Filed 08/18/25    Page 66 of 111

The Criminal Code **Schedule**
General principles of criminal responsibility **Chapter 2**
Geographical jurisdiction **Part 2.7**
Extended geographical jurisdiction **Division 15**

Section 15.2

(c) the conduct constituting the alleged offence occurs wholly outside Australia and:

    (i) at the time of the alleged offence, the person is an Australian citizen; or

    (ii) at the time of the alleged offence, the person is a resident of Australia; or

    (iii) at the time of the alleged offence, the person is a body corporate incorporated by or under a law of the Commonwealth or of a State or Territory; or

(d) all of the following conditions are satisfied:

    (i) the alleged offence is an ancillary offence;

    (ii) the conduct constituting the alleged offence occurs wholly outside Australia;

    (iii) the conduct constituting the primary offence to which the ancillary offence relates, or a result of that conduct, occurs, or is intended by the person to occur, wholly or partly in Australia or wholly or partly on board an Australian aircraft or an Australian ship.

Note:   The expression *offence* is given an extended meaning by subsections 11.2(1) and 11.2A(1), section 11.3 and subsection 11.6(1).

*Defence—primary offence*

(2) If a law of the Commonwealth provides that this section applies to a particular offence, a person does not commit the offence if:

    (aa) the alleged offence is a primary offence; and

    (a) the conduct constituting the alleged offence occurs wholly in a foreign country, but not on board an Australian aircraft or an Australian ship; and

    (b) the person is neither:

        (i) an Australian citizen; nor

        (ii) a body corporate incorporated by or under a law of the Commonwealth or of a State or Territory; and

    (c) there is not in force in:

        (i) the foreign country where the conduct constituting the alleged offence occurs; or

Authorised Version C2025C00060 registered 08/02/2025

SBU LEGAL

Schedule  The Criminal Code
Chapter 2  General principles of criminal responsibility
Part 2.7  Geographical jurisdiction
Division 15  Extended geographical jurisdiction

## Section 15.2

        (ii)  the part of the foreign country where the conduct constituting the alleged offence occurs;

a law of that foreign country, or a law of that part of that foreign country, that creates an offence that corresponds to the first-mentioned offence.

Note:      A defendant bears an evidential burden in relation to the matters in subsection (2). See subsection 13.3(3).

(3)  For the purposes of the application of subsection 13.3(3) to an offence, subsection (2) of this section is taken to be an exception provided by the law creating the offence.

*Defence—ancillary offence*

(4)  If a law of the Commonwealth provides that this section applies to a particular offence, a person does not commit the offence if:

    (a)  the alleged offence is an ancillary offence; and

    (b)  the conduct constituting the alleged offence occurs wholly in a foreign country, but not on board an Australian aircraft or an Australian ship; and

    (c)  the conduct constituting the primary offence to which the ancillary offence relates, or a result of that conduct, occurs, or is intended by the person to occur, wholly in a foreign country, but not on board an Australian aircraft or an Australian ship; and

    (d)  the person is neither:

        (i)  an Australian citizen; nor

        (ii)  a body corporate incorporated by or under a law of the Commonwealth or of a State or Territory; and

    (e)  there is not in force in:

        (i)  the foreign country where the conduct constituting the primary offence to which the ancillary offence relates, or a result of that conduct, occurs, or is intended by the person to occur; or

        (ii)  the part of the foreign country where the conduct constituting the primary offence to which the ancillary offence relates, or a result of that conduct, occurs, or is intended by the person to occur;

*Criminal Code Act 1995*

Compilation No. 167

Compilation date: 08/02/2025

Authorised Version C2025C00060 registered 08/02/2025

SBU - LEGAL

The Criminal Code **Schedule**
General principles of criminal responsibility **Chapter 2**
Geographical jurisdiction **Part 2.7**
Extended geographical jurisdiction **Division 15**

Section 15.3

a law of that foreign country, or a law of that part of that
foreign country, that creates an offence that corresponds to
the primary offence.

Note:    A defendant bears an evidential burden in relation to the matters in
subsection (4). See subsection 13.3(3).

(5) For the purposes of the application of subsection 13.3(3) to an
offence, subsection (4) of this section is taken to be an exception
provided by the law creating the offence.

Authorised Version C2025C00060 registered 08/02/2025
SBU - LEGAL

The Criminal Code  **Schedule**
Dangers to the community  **Chapter 9**
Serious drug offences  **Part 9.1**
Preliminary  **Division 300**

Section 300.3

*transport* includes deliver.

## 300.3  Geographical jurisdiction

Section 15.2 (extended geographical jurisdiction—category B)
applies to each offence against this Part.

Compilation No. 167                    Compilation date: 08/02/2025

Authorised SBU e2LEGAL registered 08/02/2025

# Dictionary

*ancillary offence* means:

    (a)  an offence against section 11.1, 11.4 or 11.5; or

    (b)  an offence against a law of the Commonwealth, to the extent
          to which the offence arises out of the operation of
          section 11.2, 11.2A or 11.3.

Authorised Version C2025C00060 registered 08/02/2025
SBU_LEGAL

# IN THE MATTER OF
## THE EXTRADITION FROM THE UNITED STATES OF AMERICA TO AUSTRALIA OF BAO TU LUU

### CERTIFICATE IDENTIFYING EXHIBIT

This is the exhibit marked '**Exhibit C**' now produced and shown to _WILLIAM PARKER_
at the time of swearing this affidavit on 25 July 2025.

_____
Signature of deponent

Before me,

_____
Signature and details of authorised affidavit taker

MAGISTRATE   WILLIAM PARKER

'Exhibit C'

Exhibit description: Section 15B of the Crimes Act 1914.

## 15B  Time for commencement of prosecutions

(1)  Subject to subsection (1B), a prosecution of an individual for an offence against any law of the Commonwealth may be commenced as follows:

*Crimes Act 1914*                                                    *259*

Compilation No. 136          Compilation date: 17/02/2021          Registered: 26/02/2021

Authorised Version C2021C00127 registered 26/02/2021

SBU - LEGAL

Part IA General

## Section 15B

(a) if the maximum penalty which may be imposed for the offence in respect of an individual is, or includes, a term of imprisonment of more than 6 months in the case of a first conviction—at any time;

(b) in any other case—at any time within one year after the commission of the offence.

(1A) A prosecution of a body corporate for an offence against any law of the Commonwealth may be commenced as follows:

(a) if the maximum penalty which may be imposed for the offence in respect of a body corporate is, or includes, a fine of more than 150 penalty units in the case of a first conviction—at any time;

(b) in any other case—at any time within one year after the commission of the offence.

(1B) A prosecution of an individual for an offence that is taken to have been committed because of section 11.2 or 11.2A of the *Criminal Code*, or against another law of the Commonwealth dealing with aiding and abetting, in relation to an offence committed by a body corporate may be commenced as follows:

(a) if the maximum penalty which may be imposed for the principal offence in respect of a body corporate is, or includes, a fine of more than 150 penalty units in the case of a first conviction—at any time;

(b) in any other case—at any time within one year after the commission of the offence by the individual.

(2) Notwithstanding any provision in any law of the Commonwealth passed before the commencement of this Act and providing any shorter time for the commencement of the prosecution, any prosecution for an offence against the law may be commenced at any time within one year after the commission of the offence.

(3) Where by any law of the Commonwealth any longer time than the time provided by this section is provided for the commencement of a prosecution in respect of an offence against that law, a

Authorised Version C2021C00127 registered 26/02/2021

SBU LEGAL

prosecution in respect of the offence may be commenced at any
time within that longer time.

Authorised Version C2021C00127 registered 26/02/2021
SBU – LEGAL

**REQUEST FOR THE EXTRADITION OF**

**Bao Tu LUU (also known as 'CHRIS', 'Big Brother')**

**FROM THE UNITED STATES OF AMERICA**

**TO AUSTRALIA**

**AFFIDAVIT OF INVESTIGATOR**

On the 24th day of July, 2025, I, Nicholas Simon PETRECCA, of the Australian Federal Police, 155 Little Lonsdale Street, Melbourne, in the State of Victoria make oath and say:

1. I am a Police Officer holding the rank of Leading Senior Constable employed by the Australian Federal Police and currently attached to Southern Command Intelligence Unit.

2. I am the Case Officer who has investigated the alleged offences by Bao Tu LUU.

3. I joined the Australian Federal Police in 2001. Since then, I have been involved in numerous investigations into offences against laws of the Commonwealth of Australia. I have over twenty years' experience in investigating a range of Commonwealth offences, in particular, narcotics offences. During this period, I have also been responsible for the preparation of numerous briefs of evidence for the prosecution of offences by the Office of the Commonwealth Director of Public Prosecutions in Victoria.

4. At the time the alleged offending by Bao Tu LUU took place, I was part of the Trident Joint Waterfront Taskforce in Victoria (Trident), where I worked for a period of four years. Trident was responsible for investigating crime in the Victorian maritime industry and logistics supply chain. During my time in Trident, I was involved in a number of investigations involving the importation of narcotics and other border controlled items.

## Offence for which surrender is sought

5. The surrender of Bao Tu LUU from the United States of America (USA) to Australia is sought for prosecution of the following offence (the offence):

    (a) Conspiracy to import a commercial quantity of border controlled drugs, namely cocaine, contrary to sections 11.5(1) and 307.1(1) of the *Criminal Code Act 1995* (Commonwealth).

6. Bao Tu are the given names of the person whose surrender is sought and LUU is his family name. That person is hereafter referred to as LUU.



EXT LUU 00072
SBU LEGAL



**Warrant for the arrest of LUU**

7. On 2 April 2025, a Magistrate of the Melbourne Magistrates Court issued a warrant for the arrest of LUU in respect of the above offence. The warrant remains in force as at the date of this affidavit. A true copy of the warrant is annexed to this affidavit and marked '**A**'.

**Summary of the acts and omissions alleged against LUU in respect of the offence**

8. Between February 2016 and June 2017, the AFP investigated a transnational organised crime syndicate involved in the importation of a commercial quantity of cocaine into Australia. The investigation focused on the activities of Steven TRUONG (TRUONG), Van Hieu LE (LE) and Barry HO (HO) as well as their associates in Australia, Canada, Colombia, Panama and Vietnam, who were conspiring to import a commercial quantity of cocaine into Melbourne, Australia. Initial contact between AFP undercover operatives and the syndicate occurred with LE, who was known by the name "GHOST," over encrypted messaging. A subsequent investigation commenced into LE's intention to import cocaine into Australia and through ongoing encrypted messaging and enquiries, TRUONG, HO, and the other alleged offenders were identified. When their initial venture failed, LE introduced the alleged syndicate leader, LUU, to AFP undercover operatives (UNICORN and WISDOM) who were posing as corrupt dock workers with the means to facilitate the safe entry of the cocaine shipment. Over a number of physical meetings and numerous encrypted communications with UNICORN and WISDOM, LUU used his long-standing relationships with a network of cartel contacts to manage the sourcing, logistics and financing of 78 kilograms of cocaine that was imported into Melbourne, Victoria. The drugs, which were intended to be collected by LE, HO, and other associates, were seized during an interception by Australian law enforcement on 26 June 2017, resulting in the arrest of LE, HO, and a further five Australian based associates. LUU conspired with UNICORN and WISDOM via encrypted messaging and in-person meetings conducted internationally. He was not present in Australia at the time of the offending. At no time did UNICORN and WISDOM coerce or influence LUU into making any of the statements or taking any of the actions described below.

**Detailed statement of the acts and omissions alleged against LUU in respect of the offence**

9. On 15 April 2016, encrypted communications commenced on the SkyECC platform between AFP undercover operative (UCO) 300816729/449384, using the name 'UNICORN' (hereinafter referred to as UNICORN) and an unknown person using the name 'GHOST'. The communications took place using an encrypted Blackberry device sent from Canada by GHOST to UNICORN to afford them secure communications. This





intent was acknowledged in the initial messaging between GHOST and UNICORN.[1] Later discussions between UNICORN and GHOST related to services offered by UNICORN, the making of arrangements to meet a syndicate representative (TRUONG)[2] who travelled to Melbourne to verify UNICORN's credentials and access to the Port of Melbourne, fees for UNICORN's services, and arrangements for a future in-person meeting with GHOST. GHOST also created further chat groups, in which GHOST introduced a number of syndicate members and Colombian cartel associates into the discussions with UNICORN. GHOST then reached an agreement with UNICORN on fees for facilitating the import of 100 kilograms of cocaine. A further agreement was made for GHOST to meet with UNICORN in Bangkok, Thailand to discuss instructions for GHOST's cartel associates, in order to ensure a successful outcome for the venture.

10. On 30 April 2016, UNICORN and AFP UCO 806479/258888, using the name 'WISDOM' (hereinafter referred to as WISDOM), met with a male identifying himself as GHOST, in Bangkok, Thailand. As a result of personal and historical information relayed by GHOST to UNICORN and WISDOM,[3] a number of subsequent enquiries were conducted by the AFP and the Royal Thai Police. Immigration Department records[4] from Thailand, coupled with Immigration Department records[5] from Australia, matched GHOST's travel movements with those of LE (hereinafter referred to as GHOST). Discussions between UNICORN, WISDOM and GHOST covered the details of the service provided by UNICORN, WISDOM and their associates, as well as the loading, concealment and shipping information GHOST would be required to provide to ensure the arriving shipment could be accessed by UNICORN, WISDOM and their associates.

11. LUU was not involved in this attempted import. Rather, GHOST advised UNICORN and WISDOM that he is keeping LUU informed of outcomes via encrypted chats so LUU could make an informed decision to become involved at a later stage. On 9 August 2016, GHOST's initial attempt failed because the load of cocaine was stolen by corrupt dock workers at the point of loading in Panama. The encrypted messaging that followed between GHOST, UNICORN, and WISDOM supports the inference that GHOST was thereafter attempting to redeem the loss of the first venture by brokering a further venture

---

[1] Blackberry Photobook Court Aid – Date of messaging: - 16 April 2016 – Photos 1 – 254. Trident investigators created 'Blackberry Photobooks' as a court aid to show screenshots from UNICORN's device, of all messaging, along with a timeline and usernames (handles) used by group message participants. Username attributions are corroborated by a combination of witness testimony and digital evidence.

[2] Statement of Susan SAN JUAN – TRUONG's Australian Border Force Immigration/Travel Records corroborating TRUONG's travel to Australia

[3] Exhibit 454 – Digital Evidence Package/097.AFLOAT THAILAND 1 – N1

[4] Special Affidavit of Pol Sub-Lt Trairong PANITHANTE – Thai Immigration Records for GHOST (Translated)

[5] Statement of Lisa TELFORD – GHOST Australian Border Force Immigration/Travel Records





SBU - LEGAL

with LUU's involvement, which would add experience, influence and security through LUU's long-standing relationships with the cartels[6].

12. Following the failure of the initial import effort, GHOST and TRUONG set up additional SkyECC encrypted communication chat groups. Using these groups, GHOST and TRUONG introduced UNICORN and WISDOM to LUU in August 2016. A short time later, GHOST and TRUONG advised and assisted LUU, other syndicate members, UNICORN and WISDOM to switch over to the 'Cipher Elite' encrypted communication platform.[7] GHOST initially advised UNICORN and WISDOM, and LUU later confirmed, that LUU used the following encrypted communications identities to communicate with UNICORN and WISDOM and other syndicate members: 'circlesilent@hash.xxx',[8] 'HushTheFuckUp',[9] 'ShutTheFuckUp',[10] and 'SlaughterNine'[11]. UNICORN and WISDOM gave detailed instructions on their purported import methodology to LUU via messages in encrypted communication groups and in-person meetings.

13. At 10:47am on 1 August 2016, lawful recording from a meeting in Melbourne captured a conversation between UNICORN, WISDOM, GHOST, and his close associate and fellow syndicate member, HO (hereinafter referred to by his encrypted chat name, GRAPES).[12] GHOST describes GRAPES as his "other half in this life" and states "If I'm ever missing or in jail or dead (God forbid). Grapes will continue operations and inform you about my whereabouts"[13]. In this conversation, GHOST advised that he wanted to introduce UNICORN and WISDOM to LUU, whom he only referred to as 'BIG BROTHER'. GHOST advised UNICORN and WISDOM to travel to Vietnam, where they would be well looked after, and to meet with LUU there. GHOST discussed his dealings with cartel members in Colombia, as well as the loss of the first intended shipment of cocaine, and noted that the same issue would not re-occur if LUU were to be directly involved. GHOST advised that LUU had an established shipping system and that the cartel leaders were seeking more potential shipping systems, therefore LUU was willing to meet UNICORN and WISDOM. GHOST discussed how LUU owns the largest Mixed Martial Arts (MMA) gym in the Southern Hemisphere and said that LUU was just awarded the first and only contract to

---

[6] Blackberry Photobook Court Aid – 23 August 2016 – Photos; 2362 – 2377

[7] Blackberry Photobook Court Aid – 06 August 2016 – Photos 2146 – 2164, 2193 - 216

[8] Blackberry Photobook Court Aid – 04 August 2016 – 2077 (GHOST introduces LUU as "Circlesilent@hash.XXX" on SkyECC encrypted platform).

[9] Blackberry Photobook Court Aid – 07 August 2016 – Photo 2217 – See also paragraph 18 below. (After group changes platforms, from SkyECC to Cipher Elite, "Mister" (TRUONG) advises LUU is "HushTheFuckUp."

[10] Blackberry Photobook Court Aid – 13 April 2017 – Photos 3366 – 3371 (LUU advises he has a new encrypted ID "BFE9ED4A – ShutTheFuckUp")

[11] Blackberry Photobook Court Aid – 05 June 2017 – Photos 3628 – 3635 (GHOST advises 'BB' new encrypted ID, then LUU confirms same as: "3CAC2BE9 – Slaughternine") – BB refers to 'Big Brother' (LUU).

[12] Exhibit 454 – Digital Evidence Package, 107.AFLOAT MELBOURNE 4 – N1

[13] Blackberry Photobook Court Aid – 06 July 2016 – Photo1391 – 1392 – (GHOST states position and role in syndicate)

SBU – LEGAL

stage professional UFC events in Vietnam. GHOST also discussed how LUU controlled distribution of drugs in Melbourne. UNICORN[14] and WISDOM[15] have provided evidence of this conversation involving GHOST and GRAPES, in which GHOST identified LUU as holding greater influence over the drug cartels, such that they would not deceive him in the same manner that GHOST experienced. GHOST's and GRAPES's depiction of LUU strongly implied that LUU was a superior to GHOST and GRAPES within the syndicate.

14. At 12:59pm on 06 August 2016, in a 'SkyECC' encrypted group chat, UNICORN, WISDOM, and LUU (using the name 'circlesilent@hash.xxx') introduced themselves and discussed the failed drug import by GHOST. This group chat was set up by GHOST as a means of introducing LUU and discussing illicit business. This was LUU's first direct contact with UNICORN and WISDOM. After initial greetings, LUU sympathised in relation to the failed drug import. LUU asked UNICORN and WISDOM who was at fault for the failed import. Based on information provided to them by GHOST, UNICORN and WISDOM replied that a number of mistakes were made in Panama, which involved loading the cocaine into the wrong container, then onto the wrong vessel, which meant the import arrived into the wrong port in Melbourne and was not able to be accessed by UNICORN and WISDOM. LUU then signed off, advising UNICORN and WISDOM that he would see them soon.[16]

15. At 6:38pm on 23 August 2016, in a 'Cipher Elite' encrypted group chat, UNICORN and LUU, using the name 'HushTheFuckUp', discussed an unsuccessful attempt to meet in Bangkok, Thailand. The meeting was aborted after a terrorist linked bombing incident in that country prompted tighter security measures at border entry points. LUU acknowledged the initial import shipment was hijacked in Panama and advised that he had suspected it may happen. LUU further stated he was hesitant about meeting UNICORN and WISDOM, but needed the right people working on the project. LUU wanted to work together but was not confident with the deal GHOST brokered, and wanted to have all the details so they could decide as a team. He enquired into the amounts of drugs UNICORN and WISDOM could manage and asked them to identify piggy-back[17] companies amenable to depart from Colombia, Peru or Ecuador. LUU stated his contacts had full control of shipping in the stated countries and that he had made a lot of sales for them in Australia.[18]

---

[14] Statement of AFP UCO 300816729/449384, pages 1080 – 1083 –

[15] Statement of AFP UCO 806479/258888, page 1316 – 1318 –

[16] Blackberry Photobook Court Aid – 6 August 2016 – Photos: 2153.1,2154,2156,2157,2158,2159,2160,2161, 2162, 2163, 2165, 2166, 2167, 2169, 2170, 2171,2172,2175,2176,2178,2179,2179.1,2179.2,2180

[17] "piggy-back" methodology involves concealing illicit cargo within legitimate cargo imported by companies with lawful import histories,

[18] Blackberry Photobook Court Aid – 23 August 2016 – Photos; 2378 – 2391, (LUU sympathises regarding the loss and that he suspected it may happen due to his experience).



16. LUU willingly discussed with UNICORN and WISDOM the previous failed venture and reassured them that a further venture with his involvement would not fail. LUU outlined broadly the extent of his reach into South America, his confidence in success and his eagerness to commence shipment and importation into Australia at the earliest possible opportunity.

17. At about 11:00am on 21 September 2016, GHOST introduced UNICORN and WISDOM to LUU in person. The meeting took place in the steam room of the Khai Hoan Regency Spa, Ho Chi Minh City, Vietnam. LUU is an American male of Vietnamese descent, of a thin build, with straight short black hair and brown eyes. LUU had a thin moustache at the time. He also had the following tattoos: a faded tattoo on his right thigh, a dragon tattoo over his left shoulder, a semi-circular neck tattoo with the text "Anh" in the middle, and a tattoo with "4V4" on his left arm.[19]

18. During this meeting, LUU advised UNICORN and WISDOM that in agreeing to meet in the steam room, UNICORN and WISDOM essentially satisfied his scrutiny. The AFP understood this to mean that LUU chose to meet in a steam room to inhibit the use of recording devices. At the meeting, LUU again acknowledged the failure of the earlier attempt to import cocaine from Panama, adding that he would have been involved in that deal if the terms had been more to his liking. Specifically, LUU stated that he preferred a partnership arrangement as opposed to paying for a service in advance, which in the case of the failed import was a 'door-fee'.[20] LUU proposed what he claimed was a risk-free plan: LUU would cover the cost of the entire shipment, and UNICORN and WISDOM could either pay LUU back with cocaine from their share, or LUU would pay UNICORN and WISDOM for their share within one month of receiving the cocaine, with the final cost per kilogram to be calculated by the wholesale value at that time.[21]

19. LUU advised UNICORN and WISDOM that his contacts at the departure ports were placed at the top level, and that these contacts had full control and could arrange anything that UNICORN and WISDOM required from the receiving end. LUU said he could ship from many places including Brazil, Ecuador and Colombia, and that the price varied from each country. LUU had no preference of country to ship from and was guided by the quality of the product that was available.[22] LUU enquired about how regularly UNICORN and WISDOM could receive product and the maximum weight they could accept for each

---

<sup>19</sup> Statement of UCO 300816729/449384, page 142,

<sup>20</sup> "Door-fee" is a fee paid to corrupt port workers that arrange safe entry to illicit cargo, referred to as a 'door'

<sup>21</sup> Statement of UCO 300816729/449384, page 144-145,

<sup>22</sup> Statement of UCO 300816729/449384, page 146 and 148





SBU LEGAL

load. He also enquired about the price of the door-fees.[23] LUU, UNICORN and WISDOM discussed their respective expectations for ongoing business. LUU advised that his expectations were that they would treat each other like family, to the point that he could trust UNICORN and WISDOM enough to lend them up to one million dollars.[24] The meeting ended with UNICORN and WISDOM suggesting they discuss the deal further via an encrypted chat group. LUU agreed and confirmed that his Cipher Handle was now 'HushTheFuckUp.'[25]

20. At 10:22am on 29 September 2016, another set of messages in the 'Cipher Elite' encrypted group chat were exchanged by UNICORN, GHOST, and LUU using the name 'HushTheFuckUp':

_GHOST:_ - "Hey unicorn can you send the list of things you need again. I lost my old account and lost everything."

_UNICORN:_ - "Sure brother gimme a second. Also just to let you know thr November slot has been taken. We still have December available"

_HushTheFuckUp:_ - "I have a crew from Brazil ready to do. But there's also other countries. Brazil will be higher then other south countries. Paris. Brother remind those guys from Melbourne to send you that list of boats please. Paris: There are a few lines from Brazil and if it turns out that they land on their terminal we can kick off pretty much right away. That message from my buddy We can also do from colombia, Ecuador or peru. You tell me what's best"

_UNICORN:_ - "1. The shipping container MUST be sent via a shipping line which arrives at the West Swanson dock, DP World Melbourne. 2. We can help you identify the vessel as soon as we know which time slot works for all of us. 3. Your container cannot be venomous freight (a new company that jas had less then 6 legitmate imports into australia). 4. It cannot be a container with refrigerated food products within it. 5. Your container can either be a 20 or 40 foot container, but please let us know as early as possible. 6. Your pieces MUST be placed in the two positions closest to the door opening. The work must be able to be accessed by our team within seconds and without having to move around in the container. 7. Your pieces should be in sturdy bags. Gym bags or something similar. No more then 20 pieces in each bag. 8. All seals must match the original paperwork. The orginal seal listed on the paperwork will obviously be removed when the work is put inside, a duplicate identical

---

[23] Statement of UCO 300816729/449384, page 149
[24] Statement of UCO 300816729/449384, page 150
[25] Statement of UCO 300816729/449384, page 150





seal should replace the original seal. A second duplicate seal is to be delivered to aus separately from the work. 9. Your pieces can be hidden (if you wish), however they must be easily accessible for us to remove. 10. Providing that the above instructions are followed, and you take photos or video as proof that the container was loaded correctly we will give you our assurance that your pieces will go through smoothly from the time that the vessel doscks until we give the work to your crew in Melbourne Thanks brother, what are the prices like from Brazil?"

*HushTheFuckUp:- "Wil get those shortly"*

*GHOST: - "Unicorn assume its gonna be December. Send the list of vessels. Arriving to your port for that time slot"*

*UNICORN: - "That's gonna depend on where we send from. If we are 100% on brazil ill get the vessel details, but if you wanna consider the other alternatives ill wait until we decide*

*HushTheFuckUp: - "Give me till tomorrow to confirm"*

*UNICORN: - "No problem brother Um sure we can all agree that it needs to be done correctly, there is no point rushing the load to get it in quicker.*

*Im*"*

*HushTheFuckUp: - "100"*

*GHOST: - "Agreed"* [26]

21. The AFP understand this discussion to be about a number of countries from which LUU's contacts in the cartels can ship cocaine due to their access and level of control at various ports. The AFP also understand that the level of co-operation afforded to LUU is, as purported by him, consequential of his long-standing relationship with the South American drug cartels.

22. In October 2016, UNICORN and LUU, using the name 'HushTheFuckUp', continued to use 'Cipher Elite' encrypted group chats to discuss LUU's first attempt to import cocaine from Cartagena, Colombia to Melbourne, Australia. LUU engaged in a detailed exchange with UNICORN, resulting in an arrangement for the importation of 200 kilograms of cocaine from Cartagena, Colombia, departing on 24 November 2016, aboard the Spirit of Singapore. The vessel was scheduled to arrive in Melbourne, Australia on 20 December 2016. [27] The door-fee was agreed at AUD2.5 million for 200 kilograms of cocaine.

---

[26] Blackberry Photobook Court Aid – 29 September 2016 – Photos; 2694 – 2703,

[27] Statement of UCO 300816729/449384, page 159-165



UNICORN and WISDOM agreed to pay the deposit, with LUU to pay for UNICORN and WISDOM's share of the cocaine (being 40 kilograms of cocaine) which would be repaid by UNICORN and WISDOM on delivery.[28]

23. At about 11:07am on 04 November 2016, UNICORN and WISDOM again attended the steam room of the Khai Hoan Regency Spa, Ho Chi Minh City, Vietnam, to meet with LUU.[29] This meeting was lawfully recorded. LUU advised that his contact in Colombia wanted to have the shipping container numbers checked to ensure that the Colombian port workers were loading the correct container to the correct vessel. LUU again confirmed that the crew he was working with in Colombia had control of the whole port. LUU confirmed that he paid US$6,000 per kilogram for cocaine and that he would cover the cost of UNICORN and WISDOM's 40 kilogram share of the load. LUU confirmed that the 200 kilograms of cocaine was packed in twenty 10-kilogram bags and that he had arranged for the duplicate container seals to be flown to him separately per UNICORN's and WISDOM's instructions. LUU advised that his preference was for UNICORN and WISDOM to collect the duplicate seals from him, as it was his belief that Australians coming to Vietnam would be less scrutinised.

24. LUU reassured UNICORN and WISDOM that his contacts were reliable and, unlike the issues that plagued the failed import by GHOST, the paperwork would be correct and match up. LUU advised that the success of this first import would lead to further business. LUU advised that he intended to have a person in Colombia looking after a stockpile of cash for future imports, as it was difficult to remit cash to Colombia. LUU discussed his relationship with a Mexican cartel that does his purchasing in Colombia. UNICORN and WISDOM discussed plans for the exchange of cocaine for cash to take place in Melbourne. UNICORN, WISDOM and LUU then discussed a partnership business model for future imports.[30]

25. LUU's intention, understood from comments made by him in encrypted messaging, was to secure the 'Melbourne door' for his regular use, in order to facilitate the importation of regular shipments of up to 300 kilograms of cocaine into Australia.

26. UNICORN and LUU, using the name 'HushTheFuckUp', continued to use 'Cipher Elite' encrypted group chats throughout November 2016 to discuss shipping container numbers provided by LUU's Colombian contact. LUU requested confirmation for his contact in Colombia as to which container they should secrete the cocaine into. LUU also sought advice on the preferred manner for loading of gym bags containing cocaine into the

---

[28] Blackberry Photobook Court Aid – 04 - 31 October 2016 – Photos; 2704 – 2803
[29] Statement of UCO 300816729/449384, page 166-168
[30] Exhibit 454 – Digital Evidence Package/114.AFLOAT VIETNAM 4 – N1



nominated containers. LUU confirmed an earlier guarantee that the cocaine he intended to import would be of good quality. LUU further advised that due to a heavy military presence at the port in Cartagena, it would be too risky to load the cocaine on 24 November as planned, and it was his preference to put the operation back one week. LUU then advised that the cocaine was not loaded on the planned date due to the military presence on the port in Cartagena.[31] Discussion ensued for a future attempt to ship and LUU confirmed that he had arranged the duplicate container seals required for the 'rip'.[32]

27. In December 2016, UNICORN and LUU, using the name 'HushTheFuckUp', discussed on the 'Cipher Elite' encrypted group chat an available time slot at the Port of Melbourne for another import attempt from Colombia in February 2017. They discussed the viability of importing drugs using a different method, involving machine parts from California, USA. Using this method, LUU would have to pay more for the product, however the methodology was believed to be safer. This project was ultimately rejected because it was too small. LUU subsequently advised that he preferred to use the original 'piggy-back' methodology, importing 200 kilograms of cocaine from Colombia, for the February 2017 time slot. UNICORN and LUU negotiated payment of a deposit of AUD200,000 to secure the time slot with the port in Melbourne and discussed the remittance of this cash. LUU paid AUD200,000 cash to unregulated money remitters with instructions for this cash to be made available for collection by WISDOM in Australia, as a deposit to secure the time slot at Port of Melbourne. On 14 December 2016, WISDOM collected the cash, in Sydney, Australia. LUU, UNICORN and WISDOM confirmed the Port of Melbourne time-slot and the Vessel: Bernhard-S, departing Cartagena on 23 February 2017.[33]

28. In January 2017, UNICORN and LUU, using the name 'HushTheFuckUp', again discussed on the 'Cipher Elite' encrypted group chat the 200 kilogram cocaine shipment due to depart Cartagena, Colombia, on 23 February 2017. LUU asked UNICORN for all the confirmed details for the venture, including the vessel name and departure date. They also discussed whether UNICORN could assist LUU in wiring money to Mexico City and Sao Paulo.

29. Beginning at 4:08pm on 24 February 2017, the 'Cipher Elite' encrypted group chat between UNICORN and LUU, using the name 'HushTheFuckUp', included the following messages:

---

[31] Blackberry Photobook Court Aid – 03 - 30 November 2016 – Photos; 2804 – 2803
[32] "Rip" methodology involves the unauthorised removal of illicit drugs from sealed shipping containers. The containers are subsequently resealed using duplicate seals, by corrupt port workers.
[33] Blackberry Photobook Court Aid – 06 – 21 December 2016 – Photos, 2963 - 2991, 2995 - 3028





*UNICORN*: - "Hey brother, how are you? Just wanted to touch base and confirm that everything was loaded ok? The vessel has already left colo".

*HushTheFuckUp*: - "Should be brother. Give me few hours till they wake up to confirm".

*UNICORN*: - "Ok bro".

*HushTheFuckUp*: - "I don't want to give you any excuses bro. they didn't load it. I didn't want to hear there reasons. The deposit I don't have any problems with them keeping it. I will not give this cartel another chance. I know they have had bad runs. Im not sure if that is causing them all these problems. They are the ones that lost the load 1400 that just came on the news. I've had another crew that's been waiting to work but I told no cuz we had given away these guys the paper for Thr work already. I have another crew that can go right away from ecudaor and manzanilla. they both have stock on hand and ready. Please let me know if we can get another date. Soon is OK. I would understand if its a no. Again this is not my character."

*UNICORN*: - "lets try and sort this out. We will come to Vietnam. We can be there Tuesday."

*HushTheFuckUp*: - "I won't be in town bro. I'm gonna be in the air. I'll be in Indonesia. Would you like to meet there?"

*UNICORN*: - "I'm going to speak with the port[34] on our side and see what options we have. Wisdom is overseas at the moment. let me get back to you."

*HushTheFuckUp*: - "Ok bro"

*UNICORN* – "Ive spoken with the port. We have an option that should work for everyone, however we will need to work quickly to confirm the arrangements. If we can get a flight into vn can you meet us on Monday?"

*HushTheFuckUp*: - "Im flying tomorrow bro. I'll be in indonesia I got a crew in Ecuador that can load it. They are ready now Do you want to fly to info to meet up"

*UNICORN*: - "How long will you be there for?"

*HushTheFuckUp*: - "I'm flying around. But there around 8 days"

*UNICORN*: - "Ok let me speak with wisdom and see if if he can make it. Where in indo?"

*HushTheFuckUp*: - "Bali"

---

[34] 'the port' is a reference to associates working at the Port of Melbourne





*UNICORN:* - *"Ok. I'll get back to you bro"*

*HushTheFuckUp:* - *"OK bro. The two places they can load Juan: Impreg can leave from quayaquil Ecuador or Buena Aventura Colombia"*

*UNICORN:* - *"Ok thanks. And both teams are ready to load immediately right?"*

*HushTheFuckUp:* - *"Yes bro".*

*UNICORN:* - *"I have contacted wisdom, we will meet you next week in indo. Just gotta coordinate flights etc. We can catch up in Jakarta or bali whatever works for you".*[35]

30. The AFP understood that in these messages, LUU was advising UNICORN and WISDOM of a failed attempt of the planned loading of cocaine to the container in Cartagena, Colombia. This example is one of a number of failed attempts that delayed the planned importation. LUU persisted in progressing the venture, however, and apparently had ample access to product to continue to attempt the transport.

31. At about 11:10am on 2 March 2017, UNICORN and WISDOM meet with LUU and two of his syndicate members at Abakoi Villa, Seminyak, Indonesia. The meeting, which was lawfully recorded, concluded at about 2:26pm. Amongst the general and social nature of conversation, LUU acknowledged the previous failed attempt to import cocaine. He insisted that the deposit for the door fees be retained by the port,[36] for a future import and he advised that he would personally travel to Colombia to ensure the next attempt was successful. LUU stated that it was important that the port—i.e., the corrupt workers arranging for drug imports at the Port of Melbourne—realise that LUU and his team are serious about importing drugs and in return, the syndicate agreed to the port retaining the deposit for the next attempt. UNICORN advised that the port had an available time slot for 15 March 2017, and that if LUU's contacts were ready to send by then, the port agreed to use the deposit they already had to reserve the new slot. LUU said he would advise his contacts in Colombia straight away. LUU advised that he had been working with the current team in Colombia for a long time and vouched for them despite the failed attempt. During this conversation, LUU was replying to messages from his contacts in Colombia about the details for the new venture. UNICORN and WISDOM advised LUU that the route for this new venture would trans-ship through a number of countries. Departure would be from Buenaventura, Colombia, with stops in Panama and New Zealand, and finally to arrive in Melbourne, Australia on 10 April 2017. The nominated vessel was the Spirit of Auckland. LUU confirmed that he would arrange for two duplicate container seals.

---

[35] Blackberry Photobook Court Aid – 01 - 26 February 2017 – Photos; 3228, 3234, 3237 – 3246, 3248,

[36] "the port" is a reference to the corrupt workers at the Port of Melbourne.





32. UNICORN, WISDOM and LUU discussed the intended process after the import was successful and the cocaine was retrieved from the shipping container. Different locations would be used for the exchange of the cocaine and cash between syndicate members in Australia. LUU's syndicate members would be introduced to people from the port prior to any exchange, so that they could become familiar with one another. For the actual exchange, representatives from both parties would meet at different locations. One location would be to exchange the cocaine, while a separate location would be used to exchange the cash. A further location would be used by both parties to co-ordinate the exchanges and afford the representatives the opportunity to check that the cocaine and the cash exchanges proceed to their satisfaction. The exchanges would be reported to the co-ordinators, completing that phase of the transaction and leaving final payments to be made within the agreed timeframe.[37]

33. In March 2017, UNICORN and LUU, using the name 'HushTheFuckUp', planned another meeting in Bali, Indonesia, on the 'Cipher Elite' encrypted group chat. This meeting was to discuss another attempt to import 200 kilograms of cocaine from Colombia to Australia. In particular, LUU advised he had people that could load the cocaine at Buenaventura Port, Colombia. LUU received confirmation of the Vessel: MV Kmarin Aqua, departing Buenaventura, Colombia on 15 March 2017, trans-shipping via Balboa, Panama, onto Vessel: MV Spirit of Auckland and arriving in Melbourne, Australia on 10 April 2017. LUU inquired with UNICORN and WISDOM whether they could facilitate a side project relating to an import of illicit cigarettes. LUU confirmed that the intended load of cocaine had increased to 220 kilograms, with the extra 20 kilograms necessary to pay for his port contacts in Buenaventura, and that it would be loaded on 15 March 2017.

34. On 17 March 2017, LUU confirmed that the cocaine was not loaded in Colombia due to a lack of opportunity. LUU re-stated his intention to import and expressed his embarrassment at the situation. LUU immediately entered into discussions for a further attempt. LUU advised UNICORN that LUU's Cipher Elite encrypted phone was blocked and that he was waiting to receive another device.[38]

35. In April 2017, UNICORN and LUU, using the name 'HushTheFuckUp', discussed in a 'Cipher Elite' encrypted group chat LUU's use of a different crew in Colombia to load the cocaine for the next attempt to import the drug to Australia. LUU advised he was experiencing difficulty communicating with his contacts due to a conflict between Cipher Elite and SkyECC encrypted communications systems, which were no longer compatible.

---

[37] Exhibit 454 – Digital Evidence Package, UCO Deployments – 126.AFLOAT INDONESIA 2 – N1
[38] Blackberry Photobook Court Aid – 01 - 25 March 2017 – Photos; 3255 - 3256, 3258 - 3260, 3263 – 3269, 3272 – 3275, 3276 – 3278, 3283 – 3285, 3287, 3290 – 3295, 3302 – 3310, 3322 - 3325, 3328 – 3330,3337





LUU advised that he had acquired a new Cipher Elite encrypted communications device and changed his username to 'ShutTheFuckUp'. LUU told UNICORN that the contacts from his new crew were advising they had three options for departure ports in Peru, Ecuador and Colombia. LUU advised that his contacts could also send from Santos, Brazil. He would have to pay more for the product, but the crew would have greater control from Santos and could load from outside the port, in the freight forwarder's warehouse.[39]

36. In May 2017, messages between UNICORN and LUU, using the name 'ShutTheFuckUp', on the 'Cipher Elite' encrypted group chat, indicated that LUU had arranged for the renewal of UNICORN and WISDOM's encrypted communications subscription to ensure their lines of communication were maintained. LUU advised that he had made arrangements with his cartel contacts for another shipment attempt aboard the vessel MV Luna Maersk, departing Buenaventura, Colombia on 17 May 2017. LUU advised the cartel were not in favour of having someone fly the duplicate container seal by commercial airline as this was considered too risky. They preferred to secrete the duplicate seal in the container, along with the cocaine. The cartel had an opportunity to ship from Peru, with a load of locally manufactured cocaine, however it could not do so by the departure deadline of the nominated vessel.

37. LUU then advised that he had made arrangements for a shipment departing Balboa, Panama on 20 May 2017. The vessel selected was the MV Oluf Maersk, arriving in Melbourne, Australia. LUU confirmed this deadline could be met, however loading would not commence until payment was received, because a separate syndicate would load the cocaine in Panama. LUU advised that he had already sent USD300,000 and would send a further USD600,000 within a few days, despite not yet receiving the refund for the previous failed attempt. LUU planned to have his own people observe this container pack, to protect his decision to advance the cash.

38. After several discussions relating to payments, departure dates, and advantages of importing methamphetamine over cocaine, LUU, UNICORN and WISDOM arranged for another cocaine import opportunity in June 2017. LUU confirmed the cartel was able to load in June from two locations, Panama and Colombia, essentially doubling the cocaine amount to 200 kilograms and the potential for a successful load.[40]

39. LUU stated that the people with whom he was then working offered a deal that seemed attractive but in reality was not. They had their own shipping line to import into Australia and they were difficult to work with. LUU further advised that he was currently arranging

---

[39] Blackberry Photobook Court Aid – 05 - 28 April 2017 – Photos; 3343 - 3347, 3362 – 3424

[40] Blackberry Photobook Court Aid – 01 - 31 May 2017 – Photos; 3428 – 3450, 3456 3457, 3458 - 3464, 3468, 3470, 3473 – 3498, 3502, 3504 – 3506, 3520 – 3525, 3533 – 3535, 3558 - 3563





a lot of sales for them in Australia[41].. On 27 April 2017, LUU stated that he had had to up the shares for his associates in order to do the import work.[42] He further stated that he did not want to look silly to UNICORN's people and that his goal was the long game.[43]

40.  Between 1 and 3 June 2017, the 'Cipher Elite' encrypted group chat between UNICORN and LUU, using the name 'ShutTheFuckUp', included the following messages:

*Unicorn*: *"Goodmorning bro. The vessel is showing in Cartagena atm"*

*ShutTheFuckUp*: *"They just messaged me in the morning and said the boat is delayed bro. On its arrival."*

*Unicorn*: *"Yeah I saw that. It looks like it has docked in Cartagena now though. Is everything all set to load?"*

*ShutTheFuckUp*: *"Yes bro. They been waiting for them to confirm"*

*Unicorn*: *"Perfect bro."*

*ShutTheFuckUp*: *(Image attached 244kb, Image attached 126kg)*

*Unicorn*: *"Plz tell me that panama is still happening bro"*

*(image/screenshot of messages from handle 'Gorilla')*

*"Gorilla: Hi Bro, this time couldn't do it, the boat enter to the port[44] with delay so they didn't put it on hold, so this one enter to the port right away, no chance to do it before (09:56pm)*

*After it leaves the port we tried but left at 4am nad meny crew members on the top (09:57pm)"*

*(image/screenshot)*

*"After it leaves the port we tried but left at 4am and many cew members on the top (09:57pm)*

*But good thing is we did very good approach to this boat and we know we can do it easy (09:58pm)*

*We only need more night time (09:59pm)*

*We checked the one xoming nest week and it's perfect for us (10:00pm)*

---

[41] Blackberry Photobook Court Aid – 23 August 2016 – Photos 2378 – 2391

[42] This meant that associates would receive a larger share of the cocaine import in order to incentivise them to agree to the import.

[43] Blackberry Photobook Court Aid – 27 April 2017 – Photos 3403 - 3407

[44] "the port" is a reference to the corrupt workers at the Port of Melbourne.



*Please ask if we can work next week (10:00pm)"*

*ShutTheFuckUp*: "Yes bro, It's still happening"

*Unicorn*: "As for colo working next week I can't give the green light until the port approves it"

*ShutTheFuckUp*: "Ok bro. Please tell port about the delay the ship had."

*Unicorn*: "I will tell them for sure bro. let's just hope that everything in panama gets loaded and our actions speak louder than words. The vessel should be landing in panama in the morning, how are the port gonna load in panama?"

*ShutTheFuckUp*: "It's all set bro. Just waiting to hear the news"

*Image attached 135kb*

*(Image: blocks stacked against a wall)*

*"Panama stock"*

*Unicorn*: "100 pieces?"

*ShutTheFuckUp*: Image attached 176kb

*(Image: blocks stacked against a wall)*

*(Image: block held in hands showing large typed letters "M & N" on block)*

*ShutTheFuckUp*: Image attached 119kb  "Those the ones to load on panana"

*(Image: block held in hands showing large typed letters "k-13" on yellow on block. A bathroom sink in the background)*

*ShutTheFuckUp*: "Yes bro On there show 75"

*Unicorn*: "Ok bro"

*ShutTheFuckUp*: "Cuz 25 is for the guy loading it. And the other 25 is South side 50 is ours"

*Unicorn*: "Lolz to be honest bro I just wanna see the work on the water. After this many setbacks its not about the split or the profits. This project is 100% about proving to the port"

*ShutTheFuckUp*: "I know bro I'll update you soon"

*Unicorn*: "Thanks bro ill wait for your confirmation"

*ShutTheFuckUp*:

    *(Image of conversation between ShutTheFuckUp and Kinglohan*

*"ShutTheFuckUp: When will the confirm for us on panama em*

*<u>Kinglohan</u>: They took the work in the port already anh… they going load rite now cuz it night time there.. Once my guy wake up I will let u know once it confirm anh")*

*"I'll confirm you by morning time in Panama brother"[45]*

*<u>Unicorn</u>: "Thanks brother, its 3am in panama and the vessel is still sitting at the dock. I will wait for your good news soon. I have meeting with the port tomorrow to give them the update"*

*<u>ShutTheFuckUp</u>: "I will get you updates tonight brother"*

*<u>Unicorn</u>: "Thsnks bro"[46]*

41. In sum, here, LUU and UNICORN were discussing the arrival of the vessel: MV Spirit of Shanghai into Cartagena. LUU then advised that the Colombian syndicate were unable to load the first part of the shipment in Cartagena, and sent pictures of relevant messaging with his Colombian contact. LUU then sent pictures of the cocaine and an account of its division between stakeholders to prove to UNICORN and WISDOM that the cocaine was in his contacts' possession and ready to load in Balboa.

42. On 4 June 2017, messages from the 'Cipher Elite' encrypted group chat between UNICORN and LUU using the name 'ShutTheFuckUp', revealed the following messaging:

*<u>ShutTheFuckUp</u>: "It's loaded brother. In pan"*

*<u>Unicorn</u>: "Amazing. Thanks for the update 100 pieces confirmed?"*

*<u>ShutTheFuckUp</u>: "Lol Yes bro Im quite amazed to Never thought I would have this much trouble."*

*<u>Unicorn</u>: "Hahaha better late than never brother! Im gonna meet the port now. They will be happy"*

*<u>ShutTheFuckUp</u>: "Yeh bro. Sorry for all the delays before. It shouldn't happen like this anymore. Should be a lot smoother from here on"*

*<u>Unicorn</u>: "I will let you know about the second load in colo very soon. All good bro. lets just make this happen."*

*<u>ShutTheFuckUp</u>: "Ok brother. Ok brother"*

*<u>Unicorn</u>: "How much do you wanna send from colo next week?"*

---

[45] 'Kinglohan' – Is suspected to be a South American Cartel contact of LUU, whose identity is unknown

[46] Blackberry Photobook Court Aid – 01June 2017 – Photos; 3574 - 3590,





*ShutTheFuckUp*: "It's the same amount brother. 100 to 150. But before you lock it in please confirm so I can confirm on this side. What was the arrival date bro?"

*Unicorn*: "Ok bro let me see if we cann 100% accept it before I can commit. I will get back to you very soon Do you mean the arrival date for the panama load?"

*ShutTheFuckUp*: "Yes for panama arrival brother"

*Unicorn*: "let me check bro The schedule estimates 26th June, however it is a rough guide. It will depend on the weather, delays etc"

*ShutTheFuckUp*: "Ok brother"

*Unicorn*: "The port are very happy that load is on the water bro. I have spoken to them about opening up another slot for you to send the load from colo"

*ShutTheFuckUp*: "Thanks brother. Panama is ready to go again. I told them let's wait to see this land first"

*Unicorn*: "Yeah I think that's wise bro. These two loads land we can max out if we need too We have two options that are leaving Cartagena that would work for us: Departing 8th June, spirit of singapore, voyage 7225; or Departing 15th June, olga maersk, voyage 723S"

*ShutTheFuckUp*: "Is that both in colo?"

*Unicorn*: "Yes they both leave from the Cartagena port"

*ShutTheFuckUp*: "Ok brother. Let me pass this to colo"

*Unicorn*: "Thanks bro" [47]

43. Here, LUU indicates that he received confirmation from his cartel contact that the Panama syndicate had successfully loaded 100 kilograms of cocaine on the MV Spirit of Shanghai whilst at port in Balboa on 4 June 2017. The vessel was scheduled to arrive in the Port of Melbourne on 26 June 2017. As the result of an earlier request from LUU, UNICORN advised that his port contacts had further opportunities to receive shipments of cocaine. Two vessels, departing Cartagena, Colombia on 8 and 15 of June respectively, were offered to LUU who intended to send further shipments of between 100 and 150 kilograms each.

44. On 5 June 2017, LUU changed his 'Cipher Elite' encrypted communications identification to 'Slaughternine', which was confirmed by UNICORN during the first encrypted messages they exchanged using LUU's new identification. LUU and UNICORN thereafter

---

[47] Blackberry Photobook Court Aid – 04 June 2017 – Photos; 3606 – 3613,

clarified a misunderstanding over the various shares held over the cocaine being shipped.[48]

45. On 7 June 2017, messages from 'Cipher Elite' encrypted group chat between UNICORN and LUU, using the name 'Slaughternine', included the following:

> *Unicorn*: *"Hey bro, im meeting the port again tonight. Any update from colo?"*
>
> *Slaughternine*: *"let me get an update right now"*
>
> *Unicorn*: *"Thanks"*
>
> *Slaughternine*: *"They will attempt again on the 8th brother. leave the 15th slot to incase. But they said it's gonna happen on the 8th. I'm gonna send you come pictures of pan load now"*
>
> *Unicorn*: *"Ok bro great"*
>
> *Slaughternine*: *(Image attached 256kb)(Image attached Downloading)*
>
> *Slaughternine*: *(Image attached 185kb)(Image attached 375kb)*
>
> *Slaughternine*: *(Image attached 408kb)*
>
> *Unicorn*: *I will update the port about colo. How much are you planning on sending?"*
>
> *Slaughternine*: *"100 brother. But I asked them just now to try to do 120. Cuz I want to get you your 20"*
>
> *Unicorn*: *"Ok thanks"* [49]

46. As per previous arrangements, LUU sent pictures as proof that the cocaine was secreted in the selected container and vessel in Panama. The picture depicting the load in the container shows a black coloured duffle bag with a yellow ribbon tied around the handles, indicating this bag also contains the replacement counterfeit container seal. The AFP understands that the counterfeit container seals were required to give the false impression to border officials the container had not opened. The bag is also marked with the white coloured brand name; 'Runic'.

47. On 8 June 2017, the 'Cipher Elite' encrypted group chat between UNICORN and LUU, using the name 'Slaughternine', included the following messaging:

> *Slaughternine*: *"Bro colo side didn't load bro. If you want to give them another chance and try I'm the second date you give them. Then I will tell them. If not we can just cancel them. The pan side we can stick with on this project"*

---

[48] Blackberry Photobook Court Aid – 05 June 2017 – Photos; 3629 – 3639, 3641 – 3643,

[49] Blackberry Photobook Court Aid – 07 June 2017 – Photos; 3657 – 3665,



*Unicorn:* "Did they tell you why they werent able to load?"

*Slaughternine:* "(Image attached 271kb)

*Unicorn:* "Ok, lets try again for the second date. If they cant send then at least we still have the panama load. Are you happy with that?"

*Slaughternine:* "(Image/screenshot)     Gorilla: (08:05pm) Bro we couldn't do it, the boat arrives and went immediately to the docks to load the containers so we sen the guys in the small boat to be ready when it leaves the docks but it only do this at 7am in the morning, it was daylight at that time already...they where out from 1am to 5am waiting in the ocean...we have to wait until next week"

*Slaughternine:* "Yes brother. Thank u  What was the second date again? Can u gu e me info again. Jisy to confirm with them"

*Unicorn:* "Departing on 15th June, the Olga Maersk, Voyage 723S"

*Slaughternine:* "Thanks brother"

*Unicorn:* "np  Bro for the panama load, who is handling the handover here in aus?"

*Slaughternine:* "Ghost will be there with his team"

*Unicorn:* "Ok bro, I will speak with him and finalise all of the details before it lands"

*Slaughternine:* "Ok brother"

*Unicorn:* "Just to confirm...panama placed the dullicate seal in one of the bags yeah? Duplicate*"

*Slaughternine:* "Correct either  Brother"

*Unicorn:* "Ok. Do you have any photos of the bag, so we can get it out. The last photos were a bit blurry"

*Slaughternine:* "They have it on film. But they took that picture off the computer screen. It's the bag with yellow they said. Can't miss it for sure."

*Unicorn:* "Ok. I just wanna male sure my team know exactly which one it is"

*Slaughternine:* "It's the one with yellow. Only 1 has yellow brother"

*Unicorn:* "Ok thanks" [50]

48. On 19 June 2017, messages from the 'Cipher Elite' encrypted group chat between UNICORN and LUU, using the name 'Slaughternine', included the following:

---

[50] Blackberry Photobook Court Aid – 08 June 2017 – Photos; 3657 – 3665





SBU  LEGAL

*Unicorn:* "Hey bro"

*Slaughternine:* "Here bro"

*Unicorn:* "Im meeting with the port today, can you get me the container details. Size etc?"

*Slaughternine:* "Yes. Will pass u shortly"

*Unicorn:* "Thankyou bro. They have their people ready to receive it, just need the right equipment etc."

*Slaughternine:* "Cool"

*Slaughternine:* (Image/screenshot) – 148kb:  Depicts container door with following marks:

063 612 5

42G1

32,500 KG

71, 650 LB

3,600 KG

7,540 KB

....(indistinct)

*Unicorn:* "Thankyou bro"

*Slaughternine:* "Np brother" [51]

49. On 23 June 2017, messages from the 'Cipher Elite' encrypted group chat between UNICORN and LUU, using the name 'Slaughternine', included the following:

*Slaughternine:* "I will move your fast brother. I need to have the work to confirm prices. By u know it's really flodded now. I'll do my best. But even before I push anything I'll confirm first with u if you are ok with the price"

*Unicorn:* "Ok bro, what sort of prices are you getting at the moment?"

*Slaughternine:* "Right now it's like 175 for singles brother. I need to wait to give my people the stuff to check our before we can negotiate"

*Unicorn:* "Ok sounds good bro, im assuming that the work will be very good quality and has been tested?"

---

[51] Blackberry Photobook Court Aid – 19 June 2017 – Photos; 3787, 3788, 3790 – 3792,





> *Slaughternine:* "Haha yes brother. But u can never tell a customer that. They always wanna see"
>
> *Unicorn:* "100% bro  Was it tested in panama before purchase?"
>
> *Slaughternine:* "Yes brother. It's nice pearls  I had pictures of it. I think on my old one"
>
> *Unicorn:* "Ok bro thanks" [52]

50. LUU not only conspired with GHOST, GRAPES, TRUONG and others to import cocaine into Australia, but was proactive in ensuring the importation successfully landed in Melbourne. The many failed attempts notwithstanding, LUU regularly consulted with the AFP UCOs who were purporting to facilitate the safe entry of drugs into Australia, including paying for their encrypted communications device subscriptions to ensure communications were maintained. LUU regularly consulted his associates in South America who were responsible for supplying and secreting the drugs onto selected vessels for transport to Australia and provided screenshots depicting, among other things, piles of cocaine bricks as proof of possession.

51. LUU also provided a detailed account of how the counterfeit shipping container seal was concealed and narrowed the location down to the only bag with yellow detail. On 26 June 2017, AFP TRIDENT investigators intercepted MAERSK Shipping Container MRKU063612542G1, which was discharged from MV 'Spirit of Shanghai'. TRIDENT investigators accessed the container and removed 3 large black duffel bags bearing the 'Runic' brand. Each bag was found to contain 26 blocks of cocaine. Only one of the duffle bags had a yellow ribbon tied to it. Inside this particular bag, TRIDENT investigators located the counterfeit shipping container seal.[53] TRIDENT investigators are unsure of the exact reason why only 78 blocks (78 kg) of cocaine were included in the container and not the discussed 100 blocks (100 kg). The AFP suspects some of the cocaine may have been stolen by the crew loading the bags into the container.

### Evidence to support the prosecution of LUU

52. The following evidence is relied upon to prove LUU's offending:

- Excerpts from Blackberry Photobook Court Aid– of messaging for the month of April 2016 depicting initial encrypted communications between UNICORN and GHOST relating to checking credentials and access of UNICORN/WISDOM

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of August 2016 depicting encrypted communications involving UNICORN, WISDOM and LUU relating to importing narcotics into Australia

---

[52] Blackberry Photobook Court Aid –23 June 2017 – Photos; 3854 – 3856

[53] Exhibit 160.Crime Scene Photos CEF Images – CRAIG



EXT-LUU-00093



- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of September 2016 depicting encrypted communications involving UNICORN, GHOST and LUU relating to importing narcotics into Australia

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of October 2016 depicting encrypted communications involving UNICORN, WISDOM and LUU relating to importing narcotics into Australia

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of November 2016 depicting encrypted communications involving UNICORN and LUU relating to importing narcotics into Australia

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of December 2016 depicting encrypted communications involving UNICORN, WISDOM and LUU relating to importing narcotics into Australia

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of February 2017 depicting encrypted communications involving UNICORN and LUU relating to importing narcotics into Australia

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of March 2017 depicting encrypted communications involving UNICORN and LUU relating to importing narcotics into Australia

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of April 2017 depicting encrypted communications involving UNICORN and LUU relating to importing narcotics into Australia

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of May 2017 depicting encrypted communications involving UNICORN, WISDOM and LUU relating to importing narcotics into Australia

- Excerpts from Blackberry Photobook Court Aid – of messaging for the month of June 2017 depicting encrypted communications involving UNICORN and LUU relating to importing narcotics into Australia

- Statement of Susan SAN JUAN – Australian Border Force Officer – Testimony and evidence relating to Immigration/Travel Records for TROUNG

- Special Affidavit of Police Sub Lieutenant Trairong PANITHANTE, Royal Thai Police Officer – Testimony and evidence relating to Thai Immigration/Travel Records for GHOST (Translated)

- Statement of Lisa TELFORD –Australian Border Force Officer – Testimony relating to Immigration/Travel Records for GHOST

- Statement of AFP UCO 300816729/449384 (UNICORN) – Testimony and evidence relating to all facets of the conspiracy to import narcotics by LUU

- Statement of AFP UCO 806479/258888 (WISDOM) - Testimony and evidence relating to all facets of the conspiracy to import narcotics by LUU

- Exhibit 454 – Digital Evidence Package, containing audio recordings of UCO Deployment 097.AFLOAT THAILAND 1 – N1 – dated 30 April 2016

SBU - LEGAL

- Exhibit 454 – Digital Evidence Package, containing audio recording of UCO Deployment 114.AFLOAT VIETNAM 4 – N1 – dated 04 November 2016
- Exhibit 454 – Digital Evidence Package, containing audio recordings of UCO Deployment 107.AFLOAT MELBOURNE 4 – N1 – dated 01 August 2016
- Exhibit 454 – Digital Evidence Package, containing audio recordings of UCO Deployment – 126.AFLOAT INDONESIA 2 – N1 – dated 02 March 2017
- Exhibit 160 - Crime Scene Photos depicting cocaine extracted from shipping container MRKU 063 612 5 42G1 – Karina Ann CRAIG – Crime Scene Investigator
- Statement of AFP Crime Scene Investigator Karina Ann CRAIG – Testimony and evidence relating to recovery of narcotics which are subject of the conspiracy by LUU

53. On the basis of its investigation the Australian Federal Police believes that LUU committed the offence of conspiracy to import a commercial quantity, being 78 kilograms, of border controlled drugs, namely cocaine, into Australia.

**Nationality, physical description and identity of LUU**

54. LUU is a dual citizen of both the United States of America and Vietnam. LUU is believed to have been born in Ho Chi Minh City, Vietnam on ▮▮▮▮▮▮▮▮ LUU is of slim to medium build, about 170 – 180 centimetres tall, and weighs approximately 70-80 kilograms. LUU has short black hair, a moustache, and an olive complexion. He has tattoos on his neck (semicircular shape containing text "Anh"), left chest, left shoulder and back (dragon) and left arm (text "4V4").

55. LUU is the bearer of the following two passports:

   i)    United States of America Passport No. ▮▮▮▮▮▮

   ii)   Vietnam Passport No. ▮▮▮▮▮

56. The AFP UCOs referred to herein as UNICORN and WISDOM met with LUU in-person on 21 September and 4 November 2016 in Vietnam and on 2 March 2017 in Indonesia. These in-person meetings were arranged as the result of numerous encrypted communications with LUU, which were all for the purpose of discussing logistical and financial matters related to the importation into Australia and trafficking of illicit narcotics. The circumstances relating to their meetings in Vietnam made it possible for UNICORN and WISDOM to observe LUU's distinctive tattoos. UNICORN and WISDOM have also observed a number of photographs of LUU, which are attached to this affidavit. They can state categorically that the person they have communicated with and met in-person and know to be LUU, is the same person depicted in these photographs. Annexed and marked 'B' are copies of photographs of LUU taken between 2011 and 2024, including a State of

California drivers licence issued 04/01/2011, and a Vietnamese passport numbered ███████ issued on 07/01/2015.

**Location of LUU**

57. From the point the charge against LUU was filed and the arrest warrant issued, he has predominately remained in Ho Chi Minh City, Vietnam, with the exception of some short trips to Thailand. There has been no record of LUU travelling to Australia since being charged. Until now, there has been no record of LUU travelling to the United States of America. Since LUU was charged, his associates that were arrested in Australia have been convicted of similar charges and have all received custodial sentences. LE and HO vigorously contested the charges and have repeatedly and unsuccessfully appealed, until exhausting all avenues to overturn conviction and sentence at the High Court of Australia.

58. On 06 February 2025, LUU is believed to have departed Ho Chi Minh City, Vietnam utilising Vietnamese passport number ███████. LUU is believed to have travelled via Tokyo, then using US passport number ███████ to Hawaii, USA. It is believed LUU then flew on a domestic airline to Los Angeles, USA.

59. On 2 April 2025, the AFP received advice from the Federal Bureau of Investigation that LUU had been arrested in California pursuant to a USA domestic warrant for kidnapping and false imprisonment.

60. I make this affidavit from information gained from my own inquiries and from information that has been made known to me by other police officers and investigators from both Australian and foreign law enforcement agencies who are or have been involved in the investigation of the offence. I believe that the information above is true and correct.

SWORN by the Deponent

at 12 George Street, Parramatta on the 24th day of July 2025

_____
Deponent

Before me:

_____  (K E Thompson)

Magistrate of the State of New South Wales

## CERTIFICATE IDENTIFYING EXHIBIT

This is the exhibit marked "BL001 – referred to as Annexure 'A'" now produced and shown to ...K E Thompson...................................................................... at the time of swearing or affirming the person's affidavit on 24/07/2025.

_____
Signature of authorised affidavit taker

_____
Signature of applicant

## Exhibit "BL001"

## Authorised Charges and Arrest Warrant for Bau Tu LUU, dob ███████████

VP Form 403

| Revised 01/10 | | Total Number of Charges Submitted for this Accused | | LEAP FAX SEQUENCING Page No./Total No. of pages |
|---|---|---|---|---|
| Printer ID at which identifiers Report will be printed | | | | |

## CHARGE-SHEET WARRANT TO ARREST

222/25

FV/SA Code: Not Applicable

Copy - CDEB/Police Brief

Magistrate's Court Criminal Procedure Rules 2009 Form 5 Rule 11
(Consider all witnesses and Corroborators)

| TO THE ACCUSED | Unsuitable Dates | | | |
|---|---|---|---|---|
| Bao Tu LUU | Preferred Dates | | | |
| Ward 22, Binh Thanh District, Ho Chi Minh City | M ☒ | F ☐ | Co. ☐ | Date of Birth ▮▮▮ |
| You have been charged with an offence against the Law. Read these pages to see what you must do. | Registration No. | | | State |
| [1] MNI / JAID | Licence No. | | | State |

### Details of the charge against you

| What is the charge? | 1 | Between 21 September 2016 and 29 June 2017 at Melbourne in Victoria, Bao Tu LUU did conspire to import a substance, the substance being a border controlled drug, namely cocaine, and the quantity imported being a commercial quantity, contrary to subsection 307.1(1) of the Criminal Code Act 1995 by virtue of subsection 11.5(1). |
|---|---|---|

[2] Sub-Incident Number                                    Offence Code

Offence Literal     Conspiracy to import a border controlled drug

| Under what law? | ☐ State   ☒ C'wealth | ☐ Act   ☐ Reg. | ☐ Other - Specify | Act or Regulation No. Criminal Code Act 1995 (Cth) | Section/Clause (Full Ref) 307.1(1) |
|---|---|---|---|---|---|

Type of offence  ☐ Summary offence (You should go to Court)   ☒ Indictable offence (You must go to Court)

Request for committal proceeding   ☐ No   ☒ Yes

Are there more charges?  ☒ No   ☐ Yes - see "Continuation of Charges" attached.

| Informant | Nicholas PETRECCA | | Phone No ▮▮▮ |
|---|---|---|---|
| Agency and Address | Australian Federal Police 155 Little Lonsdale Street, Melbourne | | |
| Fax No | | Email ▮▮▮ | |
| Informant Signature | | Date | 02/04/2025 |

Charge Filed at  Melbourne Magistrates Court

| Prosecution Authorised by: | Registered Number (AFP): | 5 | 2 | 2 | 9 | Signature: |
|---|---|---|---|---|---|---|

### Request for issue of a warrant to arrest

I apply for the issue of a warrant to arrest on the following grounds:
1) To ensure the accused's appearance before court,
2) To prevent the completion, continuation of the offence and prevent the commission of further offences

### Warrant to arrest

To all members of the police force or   Nicholas PETRECCA, AFP11250
(Informant)

You are authorised to break, enter and search any place where the person named in this warrant is suspected to be, to arrest that person and bring ☒ him / * ☐ her before a Bail Justice or the Court as soon as practicable to be dealth with according to the law or cause the person to be released on bail in accordance with the endorsements on this warrant.
I am satisfied by the evidence * ☐ on oath / ☒ by affidavit that a Warrant should be issued on the following grounds:

☒ It is probable the person will not answer a summons
☐ the person has absconded or is likely to abscond
☒ the person is avoiding the service of a summons
☐ the warrant is   ☐ required   ☐ authorised by another Act namely
☒ Or for other good cause namely:

| Issue at: | MELBOURNE | ☒ Magistrate | Date |
|---|---|---|---|
| Issued by | | ☐ Registrar | 02/04/2025 |

SBU - LEGAL

Revised 01/10

| Printer ID at which Identifiers Report will be printed | Total Number of Charges Submitted for this Accused | LEAP FAX SEQUENCING Page No./Total No. of pages | VP Form 403 |
|---|---|---|---|

# CHARGE-SHEET WARRANT TO ARREST

222/25

**FV/SA Code: Not Applicable**

**Execution Copy – return to Court after execution**

Magistrate's Court Criminal Procedure Rules 2009 Form 5 Rule 11

| TO THE ACCUSED | Unsuitable Dates (Consider all witnesses and Corroborators) |
|---|---|

| Bao Tu LUU | Preferred Dates | | | |
|---|---|---|---|---|
| ⬛⬛⬛ Ward 22, Binh Thanh District, Ho Chi Minh City | M ☒ | F ☐ | Co. ☐ | Date of Birth ⬛⬛⬛ |

| You have been charged with an offence against the Law. Read these pages to see what you must do. | Registration No. | State |
|---|---|---|
| **[1] MNI / JAID** | Licence No. | State |

## Details of the charge against you

| What is the charge? | 1 | Between 21 September 2016 and 29 June 2017 at Melbourne in Victoria, Bao Tu LUU did conspire to import a substance, the substance being a border controlled drug, namely cocaine, and the quantity imported being a commercial quantity, contrary to subsection 307.1(1) of the Criminal Code Act 1995 by virtue of subsection 11.5(1) |
|---|---|---|

| [2] Sub-Incident Number | Offence Code |
|---|---|
| Offence Literal  Conspiracy to import a border controlled drug | |

| Under what law? | ☐ State  ☒ C'wealth | ☐ Act  ☐ Reg. | ☐ Other - Specify | Act or Regulation No. Criminal Code Act 1995 (Cth) | Section/Clause (Full Ref) 307.1(1) |
|---|---|---|---|---|---|

| Type of offence | ☐ Summary offence (You should go to Court) | ☒ Indictable offence (You must go to Court) |
|---|---|---|
| Request for committal proceeding | ☐ No | ☒ Yes |
| Are there more charges? | ☒ No | ☐ Yes - see "Continuation of Charges" attached. |

| Informant | Nicholas PETRECCA | Phone No ⬛⬛⬛ |
|---|---|---|
| Agency and Address | Australian Federal Police 155 Little Lonsdale Street, Melbourne | |
| Fax No | Email ⬛⬛⬛ | |
| Informant Signature | | Date | 02/04/2025 |

Charge Filed at Melbourne Magistrates Court

| Prosecution Authorised by: | Registered Number (AFP): | 5 | 2 | 2 | 9 | Signature: |
|---|---|---|---|---|---|---|

## Request for issue of a warrant to arrest

| I apply for the issue of a warrant to arrest on the following grounds: | |
|---|---|

## Warrant to arrest

| To all members of the police force or | Nicholas PETRECCA, AFP11250 |
|---|---|

You are authorised to break, enter and search any place where the person named in this warrant is suspected to be, to arrest that person and bring *☐ him / *☐ her before a Bail Justice or the Court as soon as practicable to be dealt with according to the law or cause the person to be released on bail in accordance with the endorsements on this warrant.
I am satisfied by the evidence *☐ on oath / *☒ by affidavit that a Warrant should be issued on the following grounds:

☒ It is probable the person will not answer a summons
☐ the person has absconded or is likely to abscond
☒ the person is avoiding the service of a summons
☐ the warrant is ☐ required ☐ authorised by another Act namely
☒ Or for other good cause namely:

| Issue at: | MELBOURNE | ☒ Magistrate | Date |
|---|---|---|---|
| Issued by: | | ☐ Registrar | 02/04/2025 |

EXH LUU 00090



VP Form 403

| Revised 01/10 Printer ID at which identifiers Report will be printed | Total Number of Charges Submitted for this Accused | LEAP FAX SEQUENCING Page No./Total No. of pages |
| --- | --- | --- |

# CHARGE-SHEET WARRANT TO ARREST

222/25

**FV/SA Code: Not Applicable**

Accused Copy - Bring this with you to Court | Magistrate's Court Criminal Procedure Rules 2009 Form 5 Rule 11 (Consider all witnesses and Corroborators)

| TO THE ACCUSED | Unsuitable Dates | | | |
| --- | --- | --- | --- | --- |
| Bao Tu LUU | Preferred Dates | | | |
| Ward 22, Binh Thanh District, Ho Chi Minh City | **M** ☒ | **F** ☐ | **Co.** ☐ | **Date of Birth** |

| You have been charged with an offence against the Law. Read these pages to see what you must do. | Registration No. | State |
| --- | --- | --- |
| [1] MNI / JAID | Licence No. | State |

## Details of the charge against you

| What is the charge? | 1 | Between 21 September 2016 and 29 June 2017 at Melbourne in Victoria, Bao Tu LUU did conspire to import a substance, the substance being a border controlled drug, namely cocaine, and the quantity imported being a commercial quantity, contrary to subsection 307.1(1) of the Criminal Code Act 1995 by virtue of subsection 11.5(1) |
| --- | --- | --- |

| [2] Sub-Incident Number | | Offence Code |
| --- | --- | --- |
| Offence Literal | Conspiracy to import a border controlled drug | |

| Under what law? | ☐ State  ☒ C'wealth | ☐ Act  ☐ Reg. | ☐ Other - Specify | Act or Regulation No. Criminal Code Act 1995 (Cth) | Section/Clause (Full Ref) 307.1(1) |
| --- | --- | --- | --- | --- | --- |

| Type of offence | ☐ Summary offence (You should go to Court) | ☒ Indictable offence (You must go to Court) |
| --- | --- | --- |
| Request for committal proceeding | ☐ No  ☒ Yes | |
| Are there more charges? | ☒ No  ☐ Yes - see "Continuation of Charges" attached. | |

| Informant | Nicholas PETRECCA | Phone No |
| --- | --- | --- |
| Agency and Address | Australian Federal Police 155 Little Lonsdale Street, Melbourne | |
| Fax No | | Email |
| Informant Signature | | Date | 02/04/2025 |

Charge Filed at | Melbourne Magistrates Court

| Prosecution Authorised by: | Registered Number (AFP): | 5 | 2 | 2 | 9 | Signature: |
| --- | --- | --- | --- | --- | --- | --- |

## Request for issue of a warrant to arrest

I apply for the issue of a warrant to arrest on the following grounds:

## Warrant to arrest

To all members of the police force or | Nicholas PETRECCA, AFP11250

You are authorised to break, enter and search any place where the person named in this warrant is suspected to be, to arrest that person and bring *☒ him / *☐ her before a Bail Justice or the Court as soon as practicable to be dealth with according to the law or cause the person to be released on bail in accordance with the endorsements on this warrant.
I am satisfied by the evidence *☐ on oath / *☒ by affidavit that a Warrant should be issued on the following grounds:

☒ It is probable the person will not answer a summons
☐ the person has absconded or is likely to abscond
☒ the person is avoiding the service of a summons
☐ the warrant is  ☐ required  ☐ authorised by another Act namely
☒ Or for other good cause namely:

| Issue at: | MELBOURNE | ☒ Magistrate | Date |
| --- | --- | --- | --- |
| Issued by | PAUL | ☐ Registrar | 02/04/2025 |

EXT LUU.00100

Revised 09/14

Magistrates' Court (Criminal Procedure) Rules 2006 (Form 6 Rule 12)

## DO NOT IGNORE THIS NOTICE

Do not ignore this notice.  If you do not understand this notice, you should get someone to interpret it for you immediately.  Seek legal advice.
A legal practitioner can help you decide what steps you need to take.  For free legal information or to speak a legal practitioner call:

- Victoria Legal Aid (03) 1300 792 387
- Federation of Community Legal Centres to find the centre closest to you (03) 96521500
- Victorian Aboriginal Legal Service on 1800 064 865



Revised 09/14

# PRE-HEARING DISCLOSURE NOTICE FOR MATTERS TO BE DETERMINED SUMMARILY

Section 13 Criminal Procedure Act 2009
Magistrates' Court (Criminal Procedure) Rules 2006 (Form 8 Rule 17)

You have been charged with an offence that can be heard summarily. You should speak to a legal practitioner (a lawyer) immediately.

**How can you get more information about your charge:**

Your charge-sheet will have some information about the charge. If you want more information, at any time you or your legal practitioner can make a request in writing to the informant (the person who charged you) for -

- a preliminary brief;
- a full brief (if you have been served with a Notice to Appear, you can ask only for a full brief after a summary case conference); and
- information or copies of what is listed in the preliminary or full brief at least 7 days (or more) before the next court date.

**What the informant must do:**

When the informant receives a request for more information from you or your legal practitioner he or she has -

- 14 days to give you a preliminary brief; or
- at least 14 days to give you a full brief before your contest mention or summary hearing; and
- 7 days to respond to your request.

The informant also must give you a list or copy of any new information that is relevant to the charge as soon as it is available to him or her.

In some cases, the informant can refuse to give you information. The informant must give you a notice in writing that explains why your request has been refused. Some of the reasons the informant may refuse your request are that disclosure of the information would -

- prejudice the investigation, enforcement or proper administration of the law; or
- prejudice a fair hearing of a charge or impartial adjudication of a particular case; or
- enable a person to ascertain the identity of a confidential source of information in relation to the enforcement or administration of law; or
- disclose methods or procedures of preventing, detecting, investigating contraventions or evasions of the law, the disclosure of which would be reasonably likely to prejudice the effectiveness of those methods or procedures; or
- endanger the life or physical safety of persons or their families, engaged in, or in connection with, law enforcement or persons who have provided confidential information in relation to the enforcement or administration of the law; or
- endanger the life or physical safety of a person referred to in section 43(1)(a) of the **Criminal Procedure Act 2009** or of a family member, as defined in the **Family Violence Protection Act 2008**, of such a person; or
- the informant may refuse disclosure of any information, document or thing that is requested under section 43 (1)(d) of the **Criminal Procedure Act 2009** on any ground for refusal of a witness summons; or
- the informant may refuse to disclose the particulars of any previous conviction of any witness who the informant intends to call at the hearing if the previous conviction because of its character is irrelevant to the proceeding.

**What can you do if the informant refuses to give you the information?**

You can apply to the Magistrates' Court for an order if you -

- get a written notice from the informant that they refuse to give you the requested information; or
- believe there is information that has not been disclosed that is relevant to your case.

Your legal practitioner can advise of how to apply for an order of the Magistrates' Court that the information be disclosed.

**Get legal advice before you go to court**

A legal practitioner can help you understand the charges and decide what steps you need to take.

For free legal information or to speak to a legal practitioner call:

- Victoria Legal Aid 1300 792 387
- Community Legal Centres to find the centre closest to you (03) 9652 1500
- Victorian Aboriginal Legal Service on 1800 064 865

If you are eligible you have a right to legal aid under the **Legal Aid Act** 1978. Contact Victoria Legal Aid 350 Queen St, Melbourne, VIC, 3000, 1300 792 387.



Revised 09/14

# PRE-HEARING DISCLOSURE NOTICE FOR MATTERS TO BE DETERMINED BY A COMMITTAL PROCEEDING

Section 13 Criminal Procedure Act 2009
Magistrates' Court (Criminal Procedure) Rules 2006 (Form 9 Rule 17)

You have been charged with an indictable criminal offence. You should speak to a legal practitioner (a lawyer) immediately.

### How can you get information about your charge:

Your charge-sheet will have some information about the charge. More information about the charge will be provided to you when the informant (the person who charged you) gives you a hand-up brief or plea brief.

### Hand-up Brief:

The informant must give you a hand-up brief and a statement that you have no previous convictions or a copy of your criminal record at least 42 days before the committal mention hearing.

### Plea Brief:

If you have decided to plea guilty to the charge the informant may give you a plea brief. The informant may only give you a plea brief if you have given your written consent.

### Continuing obligation of disclosure:

The informant has an obligation to disclose to you any information, document or thing that comes into their possession after a hand-up brief is given to you. The informant must give you a copy of the information or list of things as soon as possible after it comes into their possession.

### Inspection of exhibits:

You may inspect any of the items listed in a hand-up brief at a time and place agreed with the informant.

### Get legal advice before you go to court:

A legal practitioner can help you understand the charges and decide what steps you need to take.

For free legal information or to speak to a legal practitioner call:

- Victoria Legal Aid 1300 792 387
- Federation of Community Legal Centres to find the centre closest to you (03) 9652 1500
- Victorian Aboriginal Legal Service on 1800 064 865

If you are eligible you have a right to legal aid under the Legal Aid Act 1978. Contact Victoria Legal Aid 350 Queen St, Melbourne, VIC 3000 Phone:1300 792 387.

*Revised 12/06*

## NOTICE

Magistrates' Court (Criminal Procedure) Rules 2006
Schedule 3 Form 20 Rules 9.04 and 11.01

The attached information is provided to notify you or your ability to access information in relation to summary criminal proceedings commenced against you in the Magistrates' Court.

In relation to a summary criminal trial you may, at least 10 days before the date listed on the mention date, give notice in writing to the informant (the person who bought the charge) that you require any of the following:

- Copies of witness statements
- Written summaries of the substance of evidence likely to be given by persons who have not provided statements but have provided relevant information to the informant
- The names of all witnesses and persons who have provided statements or relevant information or material and also their addresses if relevant to the defence case (unless the witness or person objects and the informant believes there are reasonable grounds for refusing to provide the address)
- Access to exhibits
- Copies of any documents setting out particulars of any prior convictions or findings of guilt against yourself, and (where relevant to the proceeding), of any person the informant intends to call to give evidence
- The particulars of any medical examination carried out on yourself on behalf of the informant.

The informant may refuse to comply with any of the requirements if he or she is of the opinion that compliance would be reasonably likely to:

- Prejudice the investigation, enforcement or proper administration of the law
- Prejudice a fair trial or impartial adjudication of a particular case
- Enable a person to ascertain the identity of a confidential source of information in relation to the enforcement or administration of law
- Disclose methods or procedures of investigating breaches of the law, the disclosure of which would be reasonably likely to prejudice the effectiveness of those methods or procedures
- Endanger the life or physical safety of witnesses or their families, providers of confidential information to the informant or persons connected with law enforcement.

The informant must comply with your request or supply you with a written statement of the grounds for refusing to comply on or before 5 days before the date listed for the hearing of your case.

In the informant refuses to supply the requested information you may make application to the Court for an order compelling the informant to comply.

The time requirements for requesting or receiving information may be varied with the leave of the Court.

### Expert Witnesses
You must serve on the informant at least 7 days before the mention date, a copy of the statement of any expert witness whom you intend to call to give evidence at the hearing.

If you have any queries regarding these provisions please contact the informant in your matter (the person who brought the charge), Legal Aid Victoria or the Registrar at your local courthouse.

REGISTRAR

**Please note:** The procedure described in this NOTICE does NOT apply if you have been served with a "Brief of Evidence" pursuant to Section 37, *Magistrates' Court Act 1989*



*Revised 9/14*

---

# NOTICE

Children, Youth and Families Act 2005, Section 524

---

## READ THIS PAGE IF YOU ARE GOING TO THE CHILDREN'S COURT

**LEGAL ADVICE AND REPRESENTATION**
**In a large number of criminal cases in the Childrens' Court, you must have a lawyer. It is important for you to get legal advice as soon as possible. Take your charge - Sheet and Summons to:**

- Victoria Legal Aid 1300 792 387
- Federation of Community Legal Centres to find the centre closest to you (03) 9652 1500
- Victoria Aboriginal Legal Service on 1800 064 865

A Lawyer will advise you, explain what happens in Court and speak for you in the Courtroom. Almost all children can get Legal Aid.

**PLEADING NOT GUILTY**
You or your lawyer must let the Children's Court registrar know that you will be pleading not guilty and how many witnesses you will be bringing to court. You should telephone or go to the court in person at least **three days** before the day of the court case. Your case will not be heard on the day written in your summons. You will be told of a new date and at what Court your case will be heard.

**INDICTABLE OFFENCE**
If you have been charged with an indictable offence you must go to court. The front of the summons will tell you if you have been charged with a "Summary Offence" or a "Indictable Offence".

**GOING TO COURT**
You should arrive at the Children's Court at least half an hour before the time stated in your Charge and Summons. Go to the counter and let a registrar know that you have arrived.

**WHO CAN GO TO COURT**
Your parents should go to court with you. If you want to take anyone else, talk to your lawyer first.

**INTERPRETER**
If you or your parents need an interpreter ask someone to contact the Children's Court Registrar at least **5 days** before the hearing. An interpreter will normally be provided if the Police who charged you know that you do not speak English.





SBU LEGAL

 ...ised 09/14

# GOING TO THE MAGISTRATES' COURT

## Getting Legal Advice

It is very important to get legal help before you go to court. Legal advice will help you:

- decide if you will say that you are guilty or not guilty
- decide if you need a lawyer to speak for you in court or if you can represent yourself
- help you to prepare for your case

Getting legal advice early may also mean that you:

- only have to go to court once
- find out if you can get a grant of legal aid

You may not be able to adjourn your matter without a good reason so it is important that you are prepared.

You can get legal help from:
- Victoria Legal Aid - for help with legal problems, call Legal Help on 1300 792 387
- Victoria Legal Aid Website: http:// www.legalaid.vic.gov.au has information about going to court for a criminal charge
- Law Institute of Victoria - referral to a private lawyer. Tel: 9607 9550
- Your local Community Legal Centre (03) 9652 1500 Website: http://www.communitylaw.org.au
- Victorian Aboriginal Legal Service Tel: 1800 064 865 Website: http://www.vals.org.au

## At Court

You must go to court if you are charged with an indictable offence or on bail. If you do not go to court you may be arrested. It is important to be at court if you have been charged with a summary offence. If you do not go to court you may be arrested or the case might be heard without you.

Be at court 30 minutes before the time on your summons or bail. When you get to court let the counter staff know that you are there.

## Duty lawyer service

Victoria Legal Aid can help people at court. The type of help you get depends on your income, circumstances and what you have been charged with.

## Problems Attending Court

Each Magistrates' Court has a Court Coordinator who organises the time and date for the cases to be heard. If you have any problems it is important for you to contact this person.

If you cannot come to court because you have a good reason or because you cannot get transport, contact the court coordinator before the day of your court case. You may be able to have your case moved to a different date and possibly to another court.

http://www.magistratescourt.vic.gov.au

## Summary Case Conference

A summary case conference enables an out of court discussion between you and a police prosecutor prior to the first hearing date of your case to identify and discuss the issues in dispute. You may be required to participate in a summary case conference before your matter can be adjourned for a plea of not guilty. This discussion may determine how the charges against you will proceed before the court. The police prosecutor can discuss your case with you however will not provide legal advice.

http://www.police.vic.gov.au

## IF YOU NEED AN INTERPRETER

If you need to have an interpreter, ask someone to contact the court coordinator at least five days before the day of your court case.

## NOTE THE TIME AND DATE YOU SHOULD BE AT COURT

SBU LEGAL

**CERTIFICATE IDENTIFYING EXHIBIT**

This is the exhibit marked "BL002 – referred to as Annexure 'B'" now produced and shown to ....... *K.E. Thompson* .......................................... at the time of swearing or affirming the person's affidavit on 24/07/2025.

_____
Signature of authorised affidavit taker

_____
Signature of applicant

**Exhibit "BL002"**

Authorised Charges and Arrest Warrant for Bau Tu LUU, dob: ████

## ANNEXURE 'B'

**IMAGES OF Bao Tu LUU (born 01 January 1976), AKA "Chris" "Big Brother"**



Taken from Dept Motor Vehicles, State of California, taken 14 January 2017,



Taken from Vietnam Passport ▓▓▓▓▓ n the name Bao Tu LUU, ▓▓▓▓▓▓ issued 07 January 2015,



Taken from https://youtu.be/mUzsexaf81c 454 Life Entertainment presents the official music video for "Nitty Gritty" by Drew Deezy, Nitty & Fiji. Directed, Shot & Edited by GINOROCKS of 454 Films, released April 2013.



Taken from World Boxing Association Asia Webpage: WBA ASIA > Media > Notice, published 24 March 2023

SBU - LEGAL